**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------  x

NATHANIEL AGUDELO, HELEN                      :
OWENS, HOLLY KEITH, and                       :
AMANDA COOPER, on behalf of                   :
themselves and others similarly situated      :
                                              :
       *Plaintiffs, and Lead*     :    Civil Action No. 22-cv-4004
       *Plaintiffs for the*       :
       *Proposed Class,*          :
      v.                           :
                                              :
                                              :
RECOVCO MORTGAGE                              :
MANAGEMENT LLC, SPROUT                        :
MORTGAGE LLC, MICHAEL                         x
STRAUSS, CHRISTOPHER WRIGHT,
and ELLIOT SALZMAN
          *Defendants*

---------------------------------------------------

## DECLARATION OF BRUCE E. MENKEN IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, CONDITIONAL CERTIFICATION OF THE SETTLEMENT CLASSES, APPOINTMENT OF CLASS COUNSEL, AND APPROVAL OF PLAINTIFFS' PROPOSED NOTICE OF SETTLEMENT

       BRUCE E. MENKEN, an attorney duly admitted to practice before this Court, deposes and says under penalty of perjury as follows:

       1.      I and my firm, Menken Simpson & Rozger ("MSR"), are counsel for the Plaintiffs and the proposed settlement class herein.  Since this case was initially filed on July 8, 2022, I have litigated this case primarily with my partner Scott Simpson and my firm's Senior Associate Brenna Rabinowitz. I make this Declaration to inform the Court of the basis for the proposed settlement in this case.

2.       I write this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Conditional Certification of the Settlement Class, Appointment of Class Counsel, and Approval of Plaintiffs' Proposed Notice of Settlement.

3.       I am a founding partner of the firm Menken Simpson & Rozger LLP (formerly Beranbaum Menken LLP) in New York, New York. MSR is a five-attorney firm that was founded in 1998 and represents plaintiffs in a wide variety of employment and civil rights matters, including individual and class action litigation.

4.       I have litigated actions throughout the country as lead or class counsel.  For example, I served as lead or co-lead class counsel in *Grottano v. City* of *New York*, 15-CV-9242 (RMB) (S.D.N.Y.) (secured $12.5 million settlement on behalf of a class of visitors who were subject to invasive searches upon entry into City of New York jails to visit their family and friends); *Rodriguez v. Simplex Grinnell*, 16-cv-9605 (N.D. Ill.) ($2.6 million settlement on behalf of laborers, workmen, and mechanics who were not paid prevailing wage for their work on non-federal public works in Illinois); *Ramos, et al., v. SimplexGrinnell LP*, 796 F. Supp. 2d 346 (E.D.N.Y.) (certifying class of over 500 electrical and sprinkler technicians in NY state-wide prevailing wage case that settled in maintenance and repair claims for $5.525 million in 2012 and testing and inspection claims for $9.5 million in late 2014); *Marriot v. Montgomery County*, 03-cv-531 (DNH) (N.D.N.Y.) (inmate strip-search class action); *Bruce v. County of Rensselear*, 02-cv-847 (TJM/DRH) (N.D.N.Y.) (inmate strip-search class action); *McDaniel v. County of Schenectady*, 04-cv-0757 (GLS/RFT) (N.D.N.Y.) (inmate strip-search class action); *Perez v. Consolidated Housekeeping*, 18-cv-2979 (RER) (E.D.N.Y.) (wage and hour case that settled for $1 million in 2019); *Bahena v. Park Avenue South*, 15-cv-1507 (VSB) (S.D.N.Y.) (wage and hour case on behalf of building superintendents that settled for $650,000 in 2018).

5.      Mr. Simpson is a 2008 graduate of the University of Michigan Law School. Following his graduation, he spent seven years as criminal defense lawyer at The Bronx Defenders, a cutting-edge public defender organization in the South Bronx.  In 2012, he was promoted to supervisor and was responsible for training and supervising attorneys who handled both misdemeanor and felony cases.  Mr. Simpson joined Beranbaum Menken LLP in October 2015 as an associate and was promoted to partner on January 1, 2018.  His practice is largely focused on labor and employment. He has served as the lead attorney on several wage and hour class actions, most recently including *Williams v. Epic Security Corp.*, 358 F.Supp.3d 284 (S.D.N.Y., 2019), in which he secured a favorable decision following an over-two-week-long trial on behalf of a group of security guards.

6.      Ms. Rabinowitz joined MSR as an associate attorney in 2018 after graduating *cum laude* from the University of Pennsylvania Law School in 2016, working for a year as an Associate at multinational law firm Freshfields Bruckhaus Deringer LLP, and clerking for United States District Judge A. Richard Caputo in the Middle District of Pennsylvania. Since joining Menken Simpson & Rozger LLP's predecessor firm Beranbaum Menken LLP in 2018, Ms. Rabinowitz has worked on dozens of employment cases, where she has been responsible for handling discovery, motions, and pleadings, as well as taking and defending depositions. Ms. Rabinowitz has specifically worked on the firm's wage and hour cases, including *Rodriguez v. SimplexGrinnell*, 16-cv-9605 (N.D. Ill), a prevailing wage collective action on behalf of employees performing testing, inspection, and programming of fire alarm and sprinkler systems, and *Huggins v. Wiener et al.*, 18-cv-1037 (S.D.N.Y.), where she was the lead author of Plaintiffs' successful motion for conditional certification of collective of building superintendents in overtime and minimum wage action against a real estate company.

7.      Our decision to ask for the Court's preliminary approval of this proposed settlement has little to do with our belief in the strength of some of the claims in this case—in fact, I do not believe Defendants even have a defense to the allegation that the Company failed to pay its employees for several weeks of work performed once the corporate entities shut down on July 7, 2022. Instead, our primary concern has been the limited assets left in the accounts of the Corporate Defendants (Sprout and Recovco) and our ability to collect on a judgment against the primary individual defendant, Michael Strauss.

8.      To that end, we have expended a substantial amount of time and resources over the past seven months to determine whether it was in the Plaintiffs' and putative class's best interests to accept a settlement that would provide them compensation but fall short of what they could theoretically be entitled to if Plaintiffs were to prevail. After reviewing thousands of financial documents (and engaging a forensic accountant to assist in our understanding of Defendants' financial situation and what assets they had that could be used to pay a judgment), engaging in countless meetings and discussions with opposing counsel, including two mediations with two different mediators, an in-person meeting, a zoom meeting, and at least 15 phone conferences, consulting with the class representatives repeatedly to get their sense of what would be acceptable to the class, and conducting legal research on a number of issues to help us understand the ramifications of litigating this case, we have concluded that the proposed settlement is by far the superior path forward for the putative class in this case.

**Events Underlying Plaintiffs' Claims,  MSR's Factual Investigation and Early Filings**

9.      MSR attorneys first became aware of the events underlying this lawsuit on the morning of July 7, 2022, when one of the named Plaintiffs contacted the firm seeking legal advice.

10. From this initial call, we learned that Sprout had suddenly shut down on the previous afternoon via a company-wide Zoom call with then-President Shea Pallante.

11. Upon information and belief, on the Zoom call, Pallante informed most staff members that their positions were terminated immediately.

12. At that time, Employees were not given information about whether and for how long their health insurance benefits would continue.

13. Sprout's payroll normally went out on the 7th and 22nd day of each month, so employees were due to be paid on July 7, 2022, the day after the Zoom call.

14. The July 7, 2022, payroll would have covered employees' work from June 16-30, 2022.

15. No one received their scheduled paychecks on July 7, 2022, nor have they received them to date.

16. The July 22, 2022, payroll would have paid employees for their work from July 1, 2022, until they were terminated on July 6, 2022.

17. No one received their scheduled paychecks on July 22, 2022, nor have they received them to date.

18. Realizing the magnitude of the shutdown and the impact to hundreds of employees of not receiving pay for three weeks of work, on top of suddenly being out of a job and losing their health insurance, MSR immediately began drafting a Complaint.

19. Our Senior Associate, Brenna Rabinowitz, worked nearly around the clock to prepare the Complaint while speaking with dozens of Sprout employees who had begun contacting our firm.

20.     The Complaint was filed in the Eastern District of New York the next day on July 8, 2022, alleging violations of the Fair Labor Standards Act, New York Labor Law, and federal and state WARN Acts against Corporate Defendants Sprout Mortgage LLC ("Sprout"), Recovco Mortgage Management LLC ("Recovco") (Collectively "Corporate Defendants") and Michael Strauss.

21.     In the single week after receiving the first call about this case, Ms. Rabinowitz spent 23.2 hours speaking with dozens of prospective class members who reached out to our firm as word of the lawsuit spread amongst Sprout employees.

22.     To organize the overwhelming response among prospective class members, MSR created a questionnaire to collect standardized information from the employees who were reaching out to our firm. We received 186 returned questionnaires over the several months following the filing of the Complaint.

23.     On July 13, 2022, we learned that the Company had failed to pay premiums for Sprout employees' health insurance starting on May 1, 2022, which resulted in cancellation of their coverage.

24.     We further learned that the Company had continued to deduct healthcare premiums from employees' paychecks throughout May, June, and the first week of July 2022, but failed to forward this money to the insurance provider to maintain employees' health insurance coverage.

25.     Therefore, employees who had incurred would-be covered healthcare expenses from May 1, 2022, through July 6, 2022, began to receive bills from healthcare providers, in some cases totaling tens of thousands of dollars.

26.     We immediately began to research potential legal claims in response to this development.

27.     At the same time, we continued investigating any potential additional defendants who might be liable for Plaintiffs' unpaid wages and other claims.

28.     Through detailed questioning of prospective class members, we determined that Defendants Elliot Salzman and Christopher Wright could be properly named as Defendants under the FLSA and NYLL, given their authority to hire, fire, and otherwise set the terms and conditions of prospective class members' employment.

29.     We also decided not to name several other potential Defendants, including Pallante, after determining through these interviews that there was not enough evidence to assert viable legal claims against them.

30.     On August 3, 2022, Plaintiffs filed their First Amended Complaint as a matter of course under Fed. R. Civ. P. 15(a), adding Christopher Wright and Elliot Salzman as Defendants (collectively with Michael Strauss, the "Individual Defendants"). *See* ECF No. 26.

31.     The First Amended Complaint ("FAC") also asserted a cause of action against Corporate Defendants and Defendant Strauss for violation of their ERISA fiduciary duties in connection with the retroactive cancellation of Sprout employees' health insurance benefits. However, following the filing of the FAC, Corporate Defendants were able to reinstate Sprout employees' health insurance benefits retroactively.

32.     On October 24, 2022, Plaintiffs filed their Second Amended Complaint with the consent of all Defendants under Fed. R. Civ. P. 15(a).

33.     The Second Amended Complaint asserted claims for Corporate Defendants' and Defendant Strauss' violation of their ERISA fiduciary duties in connection with their failure to provide required COBRA notices to employees following the Sprout shutdown.

**Research into Plaintiffs' Legal Claims**

7

34.     MSR conducted extensive legal research into Sprout employees' claims before and after filing the initial Complaint.

35.     Topics that required legal research to evaluate and assess Plaintiffs' claims were:

- Whether remote employees could bring claims under the New York Labor Law;

- Whether Plaintiffs could make a successful pre-judgment motion to freeze or encumber Defendants' assets, since Sprout was clearly in a difficult financial position;

- The validity of Defendants' contemplated "seeking finances" defense to Plaintiffs' federal and New York WARN claims;

- Whether the Sprout shutdown would be considered to affect a "single site of employment" for purposes of Plaintiffs' WARN claims.

- Whether Plaintiffs in states other than New York or California had legal grounds to seek the full amount of their lost wages, or only minimum wage for the hours they had worked in the unpaid three weeks;

- What legal claims Plaintiffs could assert based on the retroactive cancelation of their health insurance benefits;

- Whether individual Defendants could be held personally liable for Plaintiffs' claims;

- Whether Plaintiffs could properly assert legal claims based on Defendants' failure to notify them of their rights under COBRA;

- Whether Plaintiffs could prevail on a pre-discovery motion for summary judgment or motion for judgment on the pleadings;

- The impact of administrative proceedings being filed against Defendants by state labor departments around the country; and

- The potential ramifications of Defendants' contemplated tactic of making individual offers of judgment under Fed. R. Civ. P. 68 to all current opt-in Plaintiffs.

**History of Negotiations and Settlement-Purposes Discovery**

36.     On July 19, 2022, we were first contacted by previous attorneys for Defendants, who expressed an interest in settling the case.

37.     It quickly became clear that we could not put together a damages calculation, and therefore could not make a principled settlement demand, until we were able to review, at minimum, Defendants' payroll records showing how much employees should have been paid in the July 7th and 22nd payrolls, and we therefore asked previous defense counsel to provide these documents on July 19, 2022.

38.     Before we received a response to this informal document request, Defendants hired their current counsel, led by Marc Wenger at the law firm of Jackson Lewis, to handle the various employment claims that were being asserted against them around the country.

39.     In August 2022, the parties commenced settlement discussions. It became clear through our communications with defense counsel that the assets available from the Corporate Defendants in this case would be very limited due to the shutdown and numerous claims of creditors being asserted against the few remaining assets.

40.     Since Michael Strauss had individual liability for Plaintiffs' state and federal wage claims, the central issue in determining whether to recommend an early settlement in this case was the extent to which Plaintiffs could collect on a future judgment against Strauss.

41.     We therefore needed to ascertain what assets Defendant Michael Strauss would have available for satisfaction of Plaintiffs' claims.

42.     From the beginning of the settlement discussions between class counsel and current defense counsel, Defendants have insisted that given the magnitude of potential claims that existed against Strauss arising from the shutdown of Sprout, an extended delay in resolving Plaintiff's claims coupled with a public trial could exponentially increase collection risk.

43.     Plaintiffs were willing to consider such collection risk as a factor in determining what would constitute a reasonable settlement, but we made clear that we could not compromise

9

Plaintiffs' recovery on the grounds of limited funds unless we conducted thorough due diligence to satisfy ourselves and our clients that additional assets were truly not available.

44.    After current defense counsel appeared in this case, we sent them document requests on August 30, 2022, seeking documents relating to the missed payrolls, employees' loss of health insurance coverage, and all Defendants' assets.

45.    The parties negotiated the terms of a confidentiality agreement to cover this pre-discovery exchange of documents and signed an agreement on September 26, 2022.

46.    On September 27, 2022, Defense counsel provided us with a class list, spreadsheets documenting the missed payrolls of July 7 and 22, 2022, and other documents relevant to Defendants' payroll practices and employees' health insurance coverage.

47.    From this production, we learned that approximately 548 employees had been terminated in the shutdown of July 6, 2022.

48.    On October 26, 2022, Plaintiffs provided Defendants with a settlement-purposes demand based on the missed payroll distributions, consisting of $4,247,179.00 in unpaid wages, an equal amount in liquidated damages, $12,122,219.70 in damages under the federal WARN Act, and $3,577,200.00 in statutory damages resulting from Defendants' COBRA notice violations.

49.    Plaintiffs' calculation did not include interest, punitive damages, or attorneys' fees and costs. On the other hand, Plaintiffs' demand included the full amount of employees' unpaid wages, while Defendants would likely have successfully argued that, under the FLSA, some portion of employees were only entitled to the minimum wage for their unpaid hours of work, rather than their full paychecks.

50.     Along with the settlement demand, Plaintiffs provided Defendants with a memorandum setting out the assumptions, estimates, and legal theories underlying their calculation of damages.

51.     Defendants responded to Plaintiffs' initial payment demand by claiming that the Company would not have the financial ability to pay an eight-figure judgment and that the collection risk against Strauss was high.

52.     In response to Plaintiffs' demand for financial information, Defendants made several rounds of disclosures relating to the financial status of both the corporate Defendants and Defendant Strauss.[1]

53.     The produced data totaled thousands of pages and was produced on a rolling basis from August 2022 through December 2022.

54.     As detailed below, we requested documents and information from Defendants to establish this information. Over the course of four months, Defendants produced thousands of financial documents.

55.     However, we also conducted our own investigation into Defendant Strauss' assets to satisfy ourselves and our clients regarding any settlement that would be based in part on collection risk and the viability of realizing a greater award amount for the benefit of Plaintiffs.

56.     Beginning in November 2022, we extensively searched the internet for information on Defendant Strauss' finances, including his previous business ventures, partnerships, and assets of his immediate family members.

---

[1] Defendants did not produce financial data of individual Defendants Wright and Salzman, but defense counsel represented that they had no assets to speak of to contribute to a settlement of Plaintiffs' claims. Plaintiffs independently investigated these Defendants and did not locate any assets that would be available to contribute to a settlement in this case, or any information to suggest such assets exist.

57.    We also spoke with numerous prospective class members who worked closely with Defendant Strauss to find out what kind of cars he drove, where he held real estate, and any other information we could learn about his potential assets and liabilities.

58.    We used this information to question Defendants about several properties potentially owned by Strauss (directly and indirectly), as well as potential holdings related to his family's involvement in equestrian sports and whether such assets could satisfy an eventual judgment.

59.    Based on what we learned from this investigation, we learned many potentially valuable assets were in fact encumbered or no longer in Defendant Strauss' possession. This information helped us to offer principled advice to our clients regarding settlement decision-making.

60.    In connection with our independent efforts to ascertain Defendant Strauss' assets, we also researched what avenues might be available to secure substantial assets during the pendency of this action, such as moving for pre-judgment attachment.

61.    As my colleagues and I began to review Defendants' financial disclosures, it became clear that it would be beneficial to consult with someone who had deeper financial expertise.

62.    After interviewing several experts, Plaintiffs engaged the assistance of Richard Barber, CPA, an experienced forensic accounting expert and Managing Partner at L.H. Frishkoff & Company.

63.    With Mr. Barber's assistance Plaintiffs reviewed thousands of pages of financial records and related documents for Corporate Defendants and Defendant Strauss.

64.     Mr. Barber also helped Plaintiffs determine what additional documents they needed to gain a complete picture of Defendants' financial status.

65.     Plaintiffs made additional document requests to Defendants based on Mr. Barber's recommendations, and Defendants continued to provide documents in response to Plaintiffs' requests on a rolling basis through December 2022.

66.     As a result of Plaintiffs' review, guided by Mr. Barber, of the financial documents produced by Defendants, Plaintiffs also considered making a motion for pre-judgment attachment of any proceeds from the anticipated sale of Defendant Strauss' Manhattan apartment and other assets, and drafted a motion which they shared with Defendants.

67.     Plaintiffs' draft motion in favor of the motion for pre-judgment attachment was a valuable tool in galvanizing and focusing the settlement negotiations and setting out Plaintiffs' position to Defendants.

68.     Mr. Barber's firm charged over $60,000 for his assistance.

69.     The parties engaged in numerous discussions about Defendants' financial status over the course of several months via phone and video conferences, emails, and an hours-long in-person settlement meeting at defense counsel's offices on January 19, 2023.

70.     The parties' extensive settlement efforts were documented in a series of letters to Magistrate Judge Dunst. See ECF Nos. 95, 114, 137, 139, 162, 165, 168, and 172.

71.     On February 1, 2023, the parties in the above-captioned matter participated in a settlement conference with Magistrate Judge Dunst. See ECF No. 146.  While the parties did not reach an agreement at the settlement conference, they continued intensive settlement negotiations thereafter.

72.     On February 7, 2023, Ms. Rabinowitz and I participated in a settlement meeting over Zoom with opposing counsel, Mr. Strauss's personal attorney Matthew Stein, and Strauss himself.

73.     On February 9, 2023, Ms. Rabinowitz and I participated in another settlement conference via phone with opposing counsel and Mr. Strauss.

74.     With Mr. Barber's help, and with the guidance of the putative class representatives, as putative class counsel we concluded that it would be difficult to collect on a future judgment against Strauss, and it was in the best interests of the class to settle the case now and get as much money to the class members as soon as possible.

**Participation of Named Plaintiffs**

75.     Named Plaintiffs in this case were extraordinarily engaged, organized, and helpful. They attended at least seven substantive phone conferences with counsel and participated in over a dozen email exchanges, offering their perspective as employees and passing along information and sentiments they were hearing from other Sprout employees.

76.     Named Plaintiffs also tipped off class counsel to the listing of Defendant Strauss' Manhattan apartment on Zillow.com, and raised the issue that the Company had withheld taxes from their paychecks but not forwarded the money to the IRS and state taxing authorities.

77.     The mortgage industry is a small one, and Defendant Strauss is an influential player in it. Named Plaintiffs risked their reputation in the industry by being the public face of this lawsuit, which generated significant coverage in press outlets covering the mortgage industry.

78.     As settlement negotiations progressed, Named Plaintiffs offered valuable insight on how Sprout employees would view various settlement arrangements, allowing class counsel to tailor their negotiation strategy to maximize the satisfaction of prospective class members.

79.     The Named Plaintiffs participated in conference calls with our firm on August 10, 2022, October 17, 2022, November 16, 2022, December 2, 2022, January 9, 2023, February 3, 2023, and February 10, 2023.

**Cooperation and Consolidation with California Class Actions**

80.     In late August 2022, Plaintiffs' counsel became aware of two additional class actions arising out of the Sprout shutdown that had been filed in California state court in the weeks following the shutdown ("*Boyer*" and "*Sawyer*").

81.     Defense counsel expressed that, due to the limited resources available for resolving all claims asserted against the Defendants, any potential settlement would need to be a global resolution that would dispose of all employment actions arising out of the shutdown.

82.     After reviewing, with Mr. Barber's assistance, a substantial number of documents relating to Defendants' financial position, counsel for Plaintiffs in the above-captioned matter ("*Agudelo*") determined that it was likely in the best interest of all class members to reach a global settlement that would allow for distribution of Defendants' available assets before they were potentially encumbered by the numerous other creditors that had already filed lawsuits against Defendants.[2]

83.     To accomplish this, counsel for Plaintiffs in the instant action entered into a Joint Prosecution Agreement on November 16, 2022, with Plaintiffs' counsel in the *Boyer* and *Sawyer* actions.

---

[2] See, e.g., *New Wave Lending Group, Inc. v. Sprout Mortgage Asset Trust et al*, 1:22-cv-06304-LLS (S.D.N.Y.) (seeking approximately $6 million); *DynAMC Solutions, LLC v. Sprout Mortgage, LLC*, 652469/2022 (N.Y. Sup. Ct.) (seeking approximately $3.4 million); *Wall Street Mortgage Bankers, Ltd. v. Sprout Mortgage Asset Trust*, 652687/2022 (N.Y. Sup. Ct.) (seeking at least $1 million); *Merchants Bank of Indiana v. Sprout Mortgage, LLC*, 2:22-cv-04480-GRB-SIL (E.D.N.Y.) (seeking $1,235,144.28); and *PNC Bank, National Association v. Sprout Mortgage, LLC et al*, 653697/2022 (N.Y. Sup. Ct.) (seeking $420,497.16 plus fees).

84.     In March 2023, in order to enact a global settlement with Defendants, Plaintiffs also agreed to join for settlement purposes with counsel in a pre-existing California class action, *Karen Kelley v. Sprout Mortgage, LLC and Does 1 through 50*, Case No. 30-2022-01246916-CU-OE-CXC, California Superior Court, Orange County ("*Kelley*"),  that had been filed in February 2022, alleging various labor law violations that almost entirely overlapped with the wage-and-hour causes of action alleged in *Boyer* and *Sawyer*, but did not concern the wage-related claims arising from the July 2022 shutdown (*Kelley*, *Boyer*, and *Sawyer* are hereinafter collectively referred to as the "California Actions.").

85.     According to the class list provided by Defendants, there are approximately 466 Class Members covered by the *Kelley* claims, including approximately 197 employees who were terminated in the July 6, 2022, shutdown and therefore also have claims relating to the events of that date.

86.     On March 16, 2023, all parties, including Plaintiffs and Defendants in *Agudelo* as well as counsel for the California Actions, participated in a  mediation before Martin F. Scheinman of Scheinman Arbitration & Mediation Services.

87.     As a result of this mediation, the parties agreed that the plaintiffs in all four separate class actions would consolidate their litigations in the Eastern District of New York for settlement purposes (the "Consolidated Actions"), accept Defendants' global settlement offer of $3.5 million, and agree on a formula for apportioning the settlement fund among the various claims asserted in all four actions.

88.     On March 24, 2023, Defendants provided all Plaintiffs' counsel with a draft Memorandum of Understanding ("MOU") regarding the settlement.

89.     On March 28, 2023, Plaintiffs provided Defendants with proposed changes to the MOU.

90.     On April 10, 2023, the parties executed the MOU.

91.     Also, on April 5, 2023, MSR attorneys held a conference with Kelley's counsel to determine a method for allocating the settlement funds among various class members. The parties then agreed to divide the settlement fund between three subclasses, as described below.

92.     On April 19, 2023, Defendants provided all Plaintiffs' counsel with a draft Settlement Agreement.

93.     On May 31 and June 1, 2023, after exchanging proposed additions and revisions, the parties executed the settlement agreement attached hereto as Exhibit 1.

94.     The Settlement Agreement reached by the parties resolves all Plaintiffs' claims asserted in *Agudelo*, *Boyer*, *Sawyer*, and *Kelley* for a total sum of $3.5 million, including all attorneys' fees and costs.

95.     Should this Court preliminarily approve this Settlement, Plaintiffs will move for final approval and submit all counsels' time records in their application for a combined attorneys' fees award of 33.33% of the total.

96.     Plaintiff's counsel does not intend to separately seek reimbursement for costs which, as detailed *supra*, have been substantial.

97.     Attached hereto as Exhibit 2 is a proposed Class Notice agreed to by the parties.

98.     Attached hereto as Exhibit 3 is a proposed Order granting Plaintiffs' Motion for Preliminary Approval.

99.     Attached hereto as Exhibit 4 is the declaration of Jamin Soderstrom in support of Plaintiffs' Motion for Preliminary Approval.

100.    Attached hereto as Exhibit 5 is the declaration of Shirin Forootan in support of Plaintiffs' Motion for Preliminary Approval.

101.    Attached hereto as Exhibit 6 is the declaration of Omid Nosrati in support of Plaintiffs' Motion for Preliminary Approval.

102.    Attached hereto as Exhibit 7 is the declaration of Jean-Claude Lapuyade in support of Plaintiffs' Motion for Preliminary Approval.

Dated: New York New York
        June 1, 2023

                                        MENKEN SIMPSON & ROZGER LLP


By:    _____
                                        Bruce Menken
                                        Scott Simpson
                                        Brenna Rabinowitz
                                        80 Pine Street, 33rd Floor
                                        New York, New York 10005
                                        212.509.1616


                                        *Attorneys for Plaintiffs and the Class*