**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------- x

NATHANIEL AGUDELO, HELEN :
OWENS, HOLLY KEITH, and :
AMANDA COOPER, on behalf of :
themselves and others similarly situated :
                                      :

        *Plaintiffs, and Lead* :   Civil Action No. 22-cv-4004
        *Plaintiffs for the* :
        *Proposed Class,* :

v.                             :

RECOVCO MORTGAGE :
MANAGEMENT LLC, SPROUT :
MORTGAGE LLC, MICHAEL x
STRAUSS, CHRISTOPHER WRIGHT,
and ELLIOT SALZMAN
        *Defendants*

---------------------------------------------


**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY**
**APPROVAL OF CLASS ACTION SETTLEMENT, CONDITIONAL CERTIFICATION**
**OF THE SETTLEMENT CLASSES, APPOINTMENT OF CLASS COUNSEL, AND**
**APPROVAL OF PLAINTIFFS' PROPOSED NOTICE OF SETTLEMENT**

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ............................................... 1

    A.  Events Underlying Plaintiffs' Claims, MSR's Factual Investigation and Early Filings .. 3

    B.  History of Negotiations and Plaintiffs' Extensive Due Diligence Efforts ..................... 4

    C.  Cooperation and Consolidation with California Class Actions ..................................... 9

III.  THE SETTLEMENT .............................................................................................. 11

IV.  ARGUMENT:  THE COURT SHOULD PRELIMINARILY APPROVE THE ............. 13
PROPOSED SETTLEMENT ............................................................................................. 13

    A.  The Settlement is within the range of fairness sufficient to send the class notice. ........ 13

        1.  The Class is Adequately Represented (First Rule 23 Factor and Second and Third
Grinnell Factors). ............................................................................................................. 15

        2.  The proposed settlement was negotiated at arm's length (Second Rule 23 Factor)... 16

        3.  Substantial costs and risks associated with further litigation make the proposed
settlement reasonable and adequate (Third Rule 23 Factor and First, Fourth, Fifth, and Sixth
Grinnell Factors). .............................................................................................................. 17

        4.  The proposed attorneys' fees are reasonable (Third Rule 23 Factor) ........................ 19

        5.  The method of distribution to class members is fair, equitable, and effective (Third
and Fourth Rule 23 Factors). ............................................................................................ 20

        6.  Defendants cannot withstand a greater judgment (Seventh Grinnell Factor) ............. 22

        7.  The settlement is reasonable in light of the best possible recovery and all possible
recovery scenarios (Eighth and Ninth Grinnell Factors). ...................................................... 23

    B.  The proposed service awards are appropriate. ............................................................. 24

V.  A SETTLEMENT CLASS SHOULD BE CERTIFIED AGAINST DEFENDANTS .......... 25

    A.  The Rule 23 Requirements. ........................................................................................ 26

    B.  B. The Class Satisfies Rule 23(a). ............................................................................. 27

        1.  The Class is Sufficiently Numerous. ......................................................................... 27

        2.  Commonality is Satisfied. ......................................................................................... 28

        3.  The Named Plaintiffs' Claims are Typical of the Class's Claims. .............................. 29

        4.  The Class is Adequately Represented. ...................................................................... 30

    C.  The Class Satisfies Rule 23(b)(3). ............................................................................. 32

        1.  Common Questions Predominate. ............................................................................. 32

        2.  A Class Action is the Superior Method for Resolving This Dispute .......................... 34

VI. THE COURT SHOULD CONDITIONALLY CERTIFY A COLLECTIVE PURSUANT TO
THE FLSA FOR SETTLEMENT PURPOSES ..................................................................... 35

VII. THE PROPOSED NOTICE IS ADEQUATE AND SHOULD BE APPROVED .............. 36

VIII. A FINAL FAIRNESS HEARING SHOULD BE SCHEDULED. .................................. 39

IX. CONCLUSION ........................................................................................................... 39

# TABLE OF AUTHORITIES

## Cases

*Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373 (E.D.N.Y. 2022)........................................ 29

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997)................................................................ 25

*Barone v. Safway Steel Products, Inc.*, 2005 WL 2009882, 03-cv-4258 (E.D.N.Y. August 23, 2005) ..................................................................................................................................... 28, 34

*Beckman v. KeyBank, N.A.*, 293 F.R.D. 467 (S.D.N.Y. 2013) .................................................... 36

*Bolanos,* 212 F.R.D. ............................................................................................................... 29, 33

*Bredbenner v. Liberty Travel, Inc.*, 2011 WL 1344745 (D.N.J. Apr. 8, 2011) ........................... 24

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)............................................. passim

*Clark v. Ecolab Inc.*, No. 04 Civ. 4488(PAC), 2010 WL 1948198 (S.D.N.Y. May 11, 2010).... 19

*Clark v. Ecolab, Inc.*, 2010 WL 1948198 (S.D.N.Y. May 11, 2010) .......................................... 25

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ...................................... 28

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007)......... 30

*Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008).......................................... 30, 31

*DynAMC Solutions, LLC v. Sprout Mortgage, LLC*, 652469/2022 (N.Y. Sup. Ct.) ................... 23

*Emeterio v. A&P Rest. Corp.*, No. 20-CV-970 (KHP), 2022 WL 274007 (S.D.N.Y. Jan. 26, 2022) ........................................................................................................................................ 15

*Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113 (S.D.N.Y. 2011)................................................. 28

*Frank v. Eastman Kodak Co.*, 228 F.R.D. 174 (W.D.N.Y. 2005)............................................... 25

*Garland v. Cohen & Krassner*, 2011 WL 6010211 (E.D.N.Y. Nov. 29, 2011) .......................... 18

*Gonzalez v. Zito Racing Stable Inc.,* 04-cv-22 (SLT)(AKT), 2008 WL 941643 (E.D.N.Y. Mar. 31, 2008) ................................................................................................................................... 33

*Gortat v. Capala Bros.*, 257 F.R.D. 353 (E.D.N.Y. 2009) ("*Gortat I*")...................................... 33

*Gortat v. Capala Bros.*, No. 07-cv-3629 (ILG)(SMG), 2009 WL 3347091 (E.D.N.Y. Oct. 16, 2009), *report and recommendation adopted*, No. 07-cv-3629 (ILG), 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010), *aff'd*, 568 F. App'x 78 (2d Cir. 2014) ("*Gortat II*") ........... 29, 30, 33

*Haddock v. Nationwide Fin. Servs., Inc.*, 262 F.R.D. 97 (D. Conn. 2009) ...................... 28, 29, 35

*Hall v. ProSource Techs., LLC*, No. 14-cv-2502 (SIL), 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) ........................................................................................................................................ 36

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ........................................................ 26

*Hasemann v. Gerber Prod. Co.*, No. 15-cv-2995 (MKB)(RER), 2019 WL 2250687 (E.D.N.Y. Feb. 20, 2019), *report and recommendation adopted as modified*, 331 F.R.D. 239 (E.D.N.Y. 2019) ......................................................................................................................................... 27

*Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701 (RPK)(RER), 2022 WL 2841909 (E.D.N.Y. July 16, 2022)............................................................................................................................ 31

*In re Beef Indust. Antitrust Lit.* 607 F.2d 167 (5th Cir. 1979), *cert denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981) ................................................................................................... 26

*In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24 (2d Cir. 2006)............................................ 27

*In re Janney Montgomery Scott LLC Fin. Consultant Litigation*, 2009 WL 2137224 (E.D. Pa. Jul. 16, 2009) ................................................................................................................................... 24

*In re Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) ........................................................................................................................................ 18

ii

*In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006) ....................................... 35

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019) ...................................................................................................... 13, 14, 15, 18

*In re Prudential Ins. Co. Of Am. Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 119 S. Ct. 890 (1999) ......................................................................................... 25

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015) ..................................................... 28

In re Take Two Interactive Sec. Litig., No. 06-cv-1131 (RJS), 2010 WL 11613684 (S.D.N.Y. June 29, 2010) .............................................................................................................. 13

*In re Visa Check / MasterMoney Antitrust Litig.*, 280 F.3d 126 (2d Cir. 2001) ..................... 32, 34

*Jankowski v. Castaldi*, 2006 WL 118973, 01-cv-0164 (SJF)(KAM) (E.D.N.Y. Jan. 13, 2006) .. 27

*Kelen v. World Fin. Network Nat. Bank*, 302 F.R.D. 56 (S.D.N.Y. 2014) .................................... 35

*Kochilas v. Nat'l Merchant Servs., Inc.*, No. 1:14-cv-00311, 2015 WL 5821631 (E.D.N.Y. Oct. 2, 2015) ................................................................................................................ 19

*Koss v. Wackenhut Corp.*, 2009 WL 928087, 03-cv-7679(SCR) (S.D.N.Y. Mar. 30, 2009) . 29, 33

*Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362 (S.D.N.Y. 2013) .................................. 19

*Mariani v. OTG Mgmt., Inc.*, No. 16 CV 01751 (CLP), 2018 WL 10468036 (E.D.N.Y. Sept. 28, 2018) ................................................................................................................... 19

*Marisol A.*, 126 F.3d ...................................................................................................... 27, 29

*Merchants Bank of Indiana v. Sprout Mortgage, LLC*, 2:22-cv-04480-GRB-SIL (E.D.N.Y.) (seeking $1,235,144.28) ................................................................................................ 23

*Meyer v. USTA*, 297 F.R.D. 75 (S.D.N.Y. 2013) ....................................................................... 28

*Mikhlin v. Oasmia Pharm. AB*, No. 19-cv-4349(NGG)(RER), 2021 WL 1259559 (E.D.N.Y. Jan. 6, 2021) .............................................................................................................. 18, 31

*Mondrian v. Trius Trucking, Inc.*, No. 119-cv-00884 (ADA)(SKO), 2022 WL 6226843 (E.D. Cal. Oct. 7, 2022) ...................................................................................................... 24

*New Wave Lending Group, Inc. v. Sprout Mortgage Asset Trust et al*, 1:22-cv-06304-LLS (S.D.N.Y.) .................................................................................................................. 23

*Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*, No. 08-cv-321 (VB) (PED), 2012 WL 857891 (S.D.N.Y. Feb. 24, 2012) ............................................................................... 37

*Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330 (S.D.N.Y. 2004) ................................................ 33

*Pernal v. Proflame Inc.*, No. 21-cv-4526 (JMW), 2022 WL 16636689 (E.D.N.Y. Nov. 2, 2022) ................................................................................................................................. 36

*PNC Bank, National Association v. Sprout Mortgage, LLC et al*, 653697/2022 (N.Y. Sup. Ct.) 23

*Puddu v. 6D Glob. Techs., Inc.*, No. 15-cv-8061 (AJN), 2021 WL 1910656 (S.D.N.Y. May 12, 2021) ...................................................................................................................... 27

*Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354 (S.D.N.Y. 2014) ............................................... 28

*Reynolds v. Fid. Invs. Institutional Operations Co., Inc.*, No. 1:18-CV-423, 2020 WL 92092 (M.D.N.C. Jan. 8, 2020) .............................................................................................. 24

*Stefaniak v. HSBC Bank, USA, NA*, No. 1-05-cv-7205, 2008 WL 7630102 (W.D.N.Y. June 28, 2008) ...................................................................................................................... 20

*Viafara v. MCIZ Corp.*, No. 12 Civ. 7452, 2014 WL 1777438 (S.D.N.Y. May 1, 2014) ........... 36

*Wall Street Mortgage Bankers, Ltd. v. Sprout Mortgage Asset Trust*, 652687/2022 (N.Y. Sup. Ct.) .......................................................................................................................... 23

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359, 131 S. Ct. 2541, 2556, 180 L. Ed. 2d 374 (2011) ........................................................................................................................ 28

iii

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96 (2d Cir. 2005) .................................. 15, 38

*Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir. 1982), *cert denied,* 464 U.S. 818, 78 L.Ed.2d 89, 104 S.Ct. 77 (1983) ............................................................................................................ 26

*Williams v. KuCoin*, No. 20-cv-2806 (GBD)(RWL), 2021 WL 5316013 (S.D.N.Y. Oct. 21, 2021), *report and recommendation adopted*, No. 20-cv-2806, 2022 WL 392404 (S.D.N.Y. Feb. 9, 2022) ......................................................................................................................... 28

*Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143, 2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) ......... 19

*Wineland v. Casey's General Stores, Inc.*, 267 F.R.D. 669 (S.D. Iowa 2009) ............................. 25

*Wolfert ex rel. Est. of Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165 (2d Cir. 2006).. 37

*Wolinsky v. Scholastic Inc.*, 900 F.Supp.2d 332 (S.D.N.Y. 2012)................................................ 36

*Zimmer Paper Products Inc. v. Berger & Montague, P.C.*, 758 F.2d 86 (3d Cir. 1985) ............. 37

**Statutes**
29 U.S.C. § 216.............................................................................................................................. 1

**Rules**
Fed. R. Civ. P. 23.................................................................................................................. passim

iv

## I.   PRELIMINARY STATEMENT

Subject to Court approval, "Plaintiffs" Nathaniel Agudelo, Helen Owens, Holly Keith, and Amanda Cooper, individually and on behalf of themselves and all others similarly situated, and Recovco Mortgage Management LLC, Sprout Mortgage LLC, Michael Strauss, Christopher Wright, and Elliot Salzman ("Defendants") have agreed to a global settlement of the Plaintiffs' and class members' claims, along with those of the plaintiffs and class members of three related California class actions, for three million five hundred thousand dollars ($3,500,000.00). [1]

Plaintiffs respectfully request that the Court: i) grant preliminary approval of the proposed settlement agreement (Exhibit 1); (ii) certify the Settlement Class pursuant to the provisions of Fed. R. Civ. P. 23(b)(3); (iii) conditionally certify the case as a collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b); (iv) schedule a fairness hearing to consider final approval of the settlement; (v) direct that notice of the proposed settlement (attached herein as Exhibit 1) and final approval hearing be provided to absent class members in a manner consistent with the Settlement Agreement and the Notice Packet, and in the form and content substantially as set forth in the Settlement Agreement; and (vi) enter the proposed Order for Preliminary Approval filed contemporaneously herewith.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed this case on July 8, 2022, alleging violations of the Fair Labor Standards Act, New York Labor Law, and federal and state WARN Acts.  *See* ECF No. 1.  On August 3, 2022, Plaintiffs amended their Complaint to name individual Defendants Wright and Salzman, and to add claims for Corporate Defendants' and Strauss' violation of their ERISA fiduciary

---

[1] Plaintiffs have filed, contemporaneously herewith, a Third Motion to Amend Complaint, consolidating three related California class actions with the instant litigation for settlement purposes. All four actions that are merged for purposes of this settlement are referred to herein as the "Consolidated Actions."

1

duties. *See* ECF No. 26. On October 24, 2022, Plaintiffs amended their Complaint once more to add claims against Corporate Defendants and Strauss for their violation of COBRA's notice requirements. *See* ECF No. 92.  As alleged in the Second Amended Complaint, all of Plaintiffs' claims stem from the abrupt closure of Sprout Mortgage on July 6, 2022, and Defendants' failure to provide notice of the shutdown or pay employees earned wages, as well as Defendants' multiple alleged breaches of fiduciary duty under ERISA. *See* ECF No. 92. Defendants filed their Answer on November 23, 2022, denying all of Plaintiffs' legal claims and asserting numerous affirmative defenses. *See* ECF No. 109.

On February 22, 2022, *Karen Kelley, v. Sprout Mortgage, LLC, a Delaware limited liability company, et al*., Case No. 30-2022-01246916-CU-OE-CXC (hereinafter "*Kelley*"), was filed in Superior Court of California, County of Orange.

On July 20, 2022, *Jared Sawyer and Scott Harvey v. Sprout Mortgage, LLC, Recovco Mortgage Management LLC, Michael Strauss, Shea Pallante, Christopher Wright, Elliot Salzman, and Does 1 through 25* (hereinafter "*Sawyer*"), Case No. 30-2022-01271017-CU-OE-CXC, was filed in Superior Court of the State of California, County of Orange.

On July 22, 2022, *Boyer v. Sprout, Recovco, & Strauss*, Case No. 37-2022-00029036-CU-OE-CTL (hereinafter "*Boyer*"), was filed in Superior Court of the State of California, County of San Diego.

In sum, *Kelley*, *Sawyer*, and *Boyer* assert claims under California state law for various wage and hour violations including violations of overtime, minimum wage, meal and rest break, and reimbursement statutes, as well as the Fair Credit Reporting Act. Further details of the procedural history of those cases are contained in the declarations of Jamin Soderstrom, Shirin Forootan, Omid Nosrati, and Jean-Claude Lapuyade, Menken Decl. Ex. 4, 5, 6, and 7.

2

A.     **Events Underlying Plaintiffs' Claims, MSR's Factual Investigation and Early Filings**

Menken Simpson & Rozger LLP ("MSR") attorneys first became aware of the events underlying this lawsuit on the morning of July 7, 2022, when one of the named Plaintiffs contacted the firm seeking legal advice. Menken Decl. at ¶ 9. From this initial call, the firm learned that Sprout had suddenly shut down on the previous afternoon via a company-wide Zoom call with then-President Shea Pallante. *Id.* at ¶ 10. Upon information and belief, on the Zoom call, Pallante informed most staff members that their positions were terminated immediately. *Id.* at ¶ 11. Employees were not given information about whether and for how long their health insurance benefits would continue. *Id.* at ¶ 12.

Sprout's payroll normally went out on the 7th and 22nd day of each month, so employees were due to be paid on July 7, 2022, the day after the Zoom call. *Id.* at ¶ 13. The July 7, 2022, payroll would have covered employees' work from June 16 to 30, 2022. *Id.* at ¶ 14. No Sprout employee received their scheduled paycheck on July 7, 2022, nor have they received them to date. *Id.* at ¶ 15. The July 22, 2022, payroll would have paid employees for their work from July 1, 2022, until they were terminated on July 6, 2022. *Id.* at ¶ 16. No one received their scheduled paychecks on July 22, 2022, nor have they received them to date. *Id.* at ¶ 17.

The Complaint was filed in the Eastern District of New York by MSR the next day on July 8, 2022, alleging violations of the Fair Labor Standards Act, New York Labor Law, and federal and state WARN Acts against Corporate Defendants Sprout Mortgage LLC ("Sprout"), Recovco Mortgage Management LLC ("Recovco") (collectively "Corporate Defendants") and Michael Strauss. *See* ECF No. 1.

On July 13, 2022, MSR learned that Defendants had retroactively canceled Sprout employees' health insurance to May 1, 2022. Menken Decl. at ¶ 23. MSR attorneys further

learned that the Company had continued to deduct healthcare premiums from employees' paychecks throughout May, June, and the first week of July 2022, but failed to forward this money to the insurance provider to maintain employees' health insurance coverage. *Id.* at ¶ 24. Therefore, employees who had incurred would-be covered healthcare expenses from May 1, 2022, through July 6, 2022, began to receive bills from healthcare providers, in some cases totaling tens of thousands of dollars. *Id.* at ¶ 25.

On August 3, 2022, Plaintiffs filed their First Amended Complaint as a matter of course under Fed. R. Civ. P. 15(a), adding Christopher Wright and Elliot Salzman as Defendants (collectively with Michael Strauss, the "Individual Defendants"). *See* ECF No. 26. The First Amended Complaint also asserted a cause of action against Corporate Defendants and Defendant Strauss for violation of their ERISA fiduciary duties in connection with the retroactive cancellation of Sprout employees' health insurance benefits. *Id.* After the First Amended Complaint was filed, Defendants retroactively reinstated employees' health insurance benefits.

On October 24, 2022, Plaintiffs filed their Second Amended Complaint with the consent of all Defendants under Fed. R. Civ. P. 15(a). *See* ECF No. 92. The Second Amended Complaint asserted claims for Corporate Defendants' and Defendant Strauss' violation of their ERISA fiduciary duties in connection with their failure to provide required COBRA notices to employees following the Sprout shutdown. *Id.*

**B.    History of Negotiations and Plaintiffs' Extensive Due Diligence Efforts**

In August 2022, MSR learned that Defendants had hired their current counsel, led by Marc Wenger at the law firm of Jackson Lewis, to handle the various employment claims that were being asserted against them around the country. Menken Decl. at ¶¶ 38-39. The parties commenced settlement discussions. *Id.* at ¶ 39.

4

It became clear through our communications with defense counsel that the assets available from the Corporate Defendants in this case would be very limited due to the shutdown and numerous claims of creditors being asserted against the few remaining assets. *Id.* at ¶ 39.

Since Michael Strauss had individual liability for Plaintiffs' state and federal wage claims, the central issue in determining whether to recommend an early settlement in this case was the extent to which Plaintiffs could collect on a future judgment against Strauss. *Id.* at ¶ 40. Plaintiffs therefore needed to ascertain what assets Defendant Michael Strauss would have available for satisfaction of Plaintiffs' claims. *Id.* at ¶ 41. From the beginning of the settlement discussions between class counsel and current defense counsel, Defendants have insisted that given the magnitude of potential claims that existed against Strauss arising from the shutdown of Sprout, an extended delay in resolving Plaintiff's claims coupled with a public trial could exponentially increase collection risk. *Id.* at ¶ 42.

Plaintiffs were willing to consider Defendants' financial status as a factor in determining what would constitute a reasonable settlement, but made clear that they could not compromise Plaintiffs' recovery on the grounds of limited funds unless counsel conducted thorough due diligence to satisfy Plaintiffs that additional assets were truly not available. *Id.* at ¶ 43.

After current defense counsel appeared in this case, Plaintiffs' counsel sent them document requests on August 30, 2022, seeking documents relating to the missed payrolls, employees' loss of health insurance coverage, and all Defendants' assets, since defense counsel made clear that available assets would be a limiting factor of any potential settlement. *Id.* at ¶ 44. The parties negotiated the terms of a confidentiality agreement to cover this pre-discovery exchange of documents which was executed on September 26, 2022. *Id.* at ¶ 45. On September 27, 2022, Defense counsel provided MSR with a class list, spreadsheets documenting the missed

5

payrolls of July 7 and 22, 2022, and other documents relevant to Defendants' payroll practices and employees' health insurance coverage. *Id.* at ¶ 46. From this production, MSR learned that approximately 548 employees had been terminated in the shutdown of July 6, 2022. *Id.* at ¶ 47.

On October 26, 2022, Plaintiffs provided Defendants with a settlement-purposes demand based on the missed payroll distributions, consisting of $4,247,179.00 in unpaid wages, an equal amount in liquidated damages, $12,122,219.70 in damages under the federal WARN Act, and $3,577,200.00 in statutory damages resulting from Defendants' COBRA notice violations. *Id.* at ¶ 48. Plaintiffs' calculation did not include interest, punitive damages, or attorneys' fees and costs. *Id.* at ¶ 49. On the other hand, Plaintiffs' demand included the full amount of employees' unpaid wages, while Defendants would likely have successfully argued that, under the FLSA, some portion of employees were only entitled to the minimum wage for their unpaid hours of work, rather than their full paychecks. *Id.*

Defendants responded to Plaintiffs' initial payment demand by claiming that the Company would not have the financial ability to pay an eight-figure judgment and that the collection risk against Strauss was high. *Id.* at ¶51. To that end, Defendants made several rounds of disclosures relating to the financial status of both the corporate Defendants and Defendant Strauss. *Id.* at ¶ 52. The produced data totaled thousands of pages and was produced on a rolling basis from August 2022 through December 2022. *Id.* at ¶ 53.

Plaintiffs' counsel also conducted their own investigation into Defendant Strauss' assets to satisfy themselves and their clients regarding any settlement that would be based in part on the limitation on available assets. *Id.* at ¶ 55. Beginning in November 2022, MSR attorneys extensively searched the internet for information on Defendant Strauss' finances, including his previous business ventures, partnerships, and assets of his immediate family members. *Id.* at ¶

6

56. MSR also spoke with numerous prospective class members who worked closely with Defendant Strauss to find out what kind of cars he drove, where he held real estate, and any other information available about his potential assets. *Id.* at ¶ 57.

Based on what was learned from this investigation, MSR was able to question Defendants about several properties potentially owned by Strauss, as well as potential holdings related to his family's involvement in equestrian sports. *Id.* at ¶ 58. From this investigation, we learned many potentially valuable assets were in fact encumbered or no longer in Defendant Strauss' possession. *Id.* at ¶ 59. This information helped MSR attorneys to offer principled advice to their clients regarding settlement decision-making. *Id.*.

In connection with MSR's independent efforts to ascertain Defendant Strauss' assets, counsel also researched what avenues might be available to secure substantial assets during the pendency of this action, such as moving for pre-judgment attachment. *Id.* at ¶ 60.

As MSR attorneys began to review Defendants' financial disclosures to determine whether Strauss was indeed insolvent, it became clear that it would be beneficial to consult with someone who had deeper financial expertise. *Id.* at ¶ 61. After interviewing several experts, Plaintiffs engaged the assistance of Richard Barber, CPA, an experienced forensic accounting expert and Managing Partner at L.H. Frishkoff & Company. *Id.* at ¶ 62. With Mr. Barber's assistance Plaintiffs reviewed thousands of pages of financial records and related documents for Corporate Defendants and Defendant Strauss. *Id.* at ¶ 63. Mr. Barber also helped Plaintiffs determine what additional documents they needed to gain a complete picture of Defendants' financial status. *Id.* at ¶ 64. Plaintiffs made additional document requests to Defendants based on Mr. Barber's recommendations, and Defendants continued to provide documents in response to Plaintiffs' requests on a rolling basis through December 2022. *Id.* at ¶ 65.

7

As a result of Plaintiffs' review, guided by Mr. Barber, of the financial documents produced by Defendants, Plaintiffs also strongly considered making a motion for pre-judgment attachment of any proceeds from the anticipated sale of Defendant Strauss' Manhattan apartment and other assets, and drafted a motion which they shared with Defendants. *Id.* at ¶ 66. Plaintiffs' draft motion in favor of the motion for pre-judgment attachment was a valuable tool in galvanizing and focusing the settlement negotiations and setting out Plaintiffs' position to Defendants. *Id.* at ¶ 67.

Mr. Barber's firm charged over $60,000 for his assistance. *Id.* at ¶ 68.

The parties then engaged in numerous discussions about Defendants' financial status over the course of several months via phone and video conferences, emails, and an hours-long in-person settlement meeting at defense counsel's offices on January 19, 2023. *Id.* at ¶ 69. The parties' extensive settlement efforts were documented in a series of letters to Magistrate Judge Dunst. See ECF Nos. 95, 114, 137, 139, 162, 165, 168, and 172.

On February 1, 2023, the parties in the above-captioned matter participated in a settlement conference with Magistrate Judge Dunst. See ECF No. 146.  While the parties did not reach an agreement at the settlement conference, they continued intensive settlement negotiations thereafter.  *Id.* at ¶ 71. On February 7, 2023, MSR attorneys participated in a settlement meeting over Zoom with opposing counsel, Mr. Strauss's personal attorney Matthew Stein, and Strauss himself. *Id.* at ¶ 72. On February 9, 2023, MSR attorneys participated in another settlement conference via phone with opposing counsel and Mr. Strauss. *Id.* at ¶ 73.

With Mr. Barber's help, and with the guidance of the putative class representatives, as putative class counsel MSR concluded that it would be difficult to collect on a future judgment against Strauss, and it was in the best interests of the class to settle the case now and get as much

8

money to the class members as possible before the corporate entities themselves became insolvent. *Id.* at ¶ 74.

      **C.**    **Cooperation and Consolidation with California Class Actions**

      In late August 2022, Plaintiffs' counsel became aware of two additional class actions arising out of the Sprout shutdown that had been filed in California state court in the weeks following the shutdown ("*Boyer*" and "*Sawyer*"). Menken Decl. at ¶ 80. Around the same time, Defense counsel took the position that any potential settlement would need to be a global resolution that would dispose of all employment actions arising out of the shutdown. *Id.* at ¶ 81.

      After reviewing, with Mr. Barber's assistance, a substantial number of documents relating to Defendants' financial position, counsel for Plaintiffs in the above-captioned matter ("*Agudelo*") determined that it was likely in the best interest of all class members to reach a global settlement that would allow for distribution of Defendants' available assets before they were potentially encumbered by the numerous other creditors that had already filed lawsuits against Defendants. *Id.* at ¶ 82. To accomplish this, counsel for Plaintiffs in the instant action entered into a Joint Prosecution Agreement on November 16, 2022, with Plaintiffs' counsel in the *Boyer* and *Sawyer* actions. *Id.* at ¶ 83.

      In March 2023, in order to enact a global settlement with Defendants, Plaintiffs also agreed to join for settlement purposes with counsel in a pre-existing California class action, *Karen Kelley v. Sprout Mortgage, LLC and Does 1 through 50*, Case No. 30-2022-01246916-CU-OE-CXC, California Superior Court, Orange County ("*Kelley*"), that had been filed in February 2022, alleging various labor law violations that almost entirely overlapped with the wage-and-hour causes of action alleged in *Boyer* and *Sawyer*, but did not concern the wage-related claims arising from the July 2022 shutdown (*Kelley*, *Boyer*, and *Sawyer* are hereinafter

collectively referred to as the "California Actions."). Nosrati Decl. at ¶ 22. According to the class list provided by Defendants, there are approximately 466 Class Members covered by the *Kelley* claims, including approximately 197 employees who were terminated in the July 6, 2022, shutdown and therefore also have claims relating to the events of that date. Menken Decl. at ¶ 85.

Attorneys in the *Kelley* action have also devoted a substantial amount of time and resources since filing their lawsuit to determining whether a settlement for less than the full amount Plaintiffs could receive if they pursued their claims all the way through litigation. Nosrati Decl. at ¶ 12. Like MSR's attorneys, the *Kelley* attorneys concluded that, given Defendants' financial position, the instant settlement would provide the best outcome for their clients. *Id.* at ¶ 20.

**Second Mediation and The Parties Reach an Agreement**

On March 16, 2023, all parties, including Plaintiffs and Defendants in *Agudelo* as well as counsel for the California Actions, participated in a mediation before Martin F. Scheinman of Scheinman Arbitration & Mediation Services. Menken Decl. at ¶ 86. As a result of this mediation, the parties agreed that the plaintiffs in all four separate class actions would consolidate their litigations in the Eastern District of New York for settlement purposes (the "Consolidated Actions"), accept Defendants' global settlement offer of $3.5 million, and agree on a formula for apportioning the settlement fund among the various claims asserted in all four actions. *Id.* at ¶ 87.

On March 24, 2023, Defendants provided all Plaintiffs' counsel with a draft Memorandum of Understanding ("MOU") regarding the settlement. *Id.* at ¶ 88. On March 28,

10

2023, Plaintiffs provided Defendants with proposed changes to the MOU, and on April 10, 2023, the parties executed the MOU. *Id.* at ¶¶ 89-90.

On April 5, 2023, MSR attorneys held a conference with *Kelley*'s counsel to determine a method for allocating the settlement funds among various class members. The parties then agreed to divide the settlement fund between three subclasses, as described below. *Id.* at ¶ 91.

On April 19, 2023, Defendants provided all Plaintiffs' counsel with a draft Settlement Agreement. *Id.* at ¶ 92. On April 26, 2023, after exchanging proposed additions and revisions, the parties executed the settlement agreement attached to the Menken Declaration as Exhibit 1.

The Settlement Agreement reached by the parties resolves all Plaintiffs' claims asserted in *Agudelo*, *Boyer*, *Sawyer*, and *Kelley* for a total sum of $3.5 million, including all attorneys' fees and costs. *Id.* at ¶ 94. Should this Court preliminarily approve this Settlement, Plaintiffs will move for final approval and submit all counsels' time records in their application for a combined attorneys' fees award of 33.33% of the total. *Id.* at ¶ 95. Plaintiff's counsel does not intend to separately seek reimbursement for costs which, as detailed *supra*, have been substantial. *Id.* at ¶ 96.

### III.  THE SETTLEMENT

Defendants agree to settle the Consolidated Actions for a total sum of $3,500,000.00. Exhibit 1, ¶ 65.  Defendants agree not to oppose the Plaintiffs' application for 33.33% of the settlement, or $1,166,550, as attorney's fees to be distributed among counsel in all four Consolidated Actions. *Id.* at ¶ 77. The agreement further provides for $2,500 in incentive awards for each of the ten named Plaintiffs between the Consolidated Actions, and for an as-yet unknown amount in settlement administration costs. *Id.* at ¶ 74. The net settlement to the class members thus totals approximately $2.1 million (the "Net Settlement Fund"). The Settlement

11

contemplates three different classes: (1) the "Shutdown Class," defined as "all employees of Sprout Mortgage who were employed between June 6, 2022 and July 7, 2022 and did not receive wages for work performed during that period;" (2) the "California Labor Class," defined as "All non-exempt employees of Sprout Mortgage who worked for Sprout Mortgage while residing in California between February 22, 2018, and July 6, 2022;" and (3) the "FCRA Class," defined as "All employees of Sprout Mortgage who worked for Sprout Mortgage while residing in California between February 22, 2018, and July 6, 2022."[2] *See Id.* at ¶¶ 5, 17, 64. Many class members will be included in more than one settlement class.

California Labor Class members will receive approximately $306,000 in total, with each Class member being paid for one hour of overtime based on the employee's regular rate of pay, up to a cap of $1,000. FCRA/ICRAA class members will receive a flat amount of $30 each, amounting to $13,980 in total. Finally, Shutdown Class members will receive a *pro rata* share, based on their portion of the unpaid wages from the Sprout payrolls of July 7 and 22, 2022, of the remainder of the Net Settlement Fund, which is estimated to be $1.78 million in total, providing each employee with approximately 42% of their unpaid wages.  *See* Exhibit 1, ¶ 80; Exhibit 3.  Each class member's signature on their settlement check will additionally serve as the member's opt-in to the collective and release of the class member's FLSA claims.  *Id.*, ¶ 82.

The class members who are eligible to receive payments are those class members who do not submit a valid and timely Opt-Out Form.  Notice providing the class with the opportunity to opt out will be sent to the class in the form set forth in Menken Decl. Ex. 2, which is also exhibit F to the settlement agreement. Pursuant to Federal Rules of Civil Procedure 23(h) and 54(d)(2),

---

[2] "Settlement Class" refers collectively to all members of the Shutdown Class, California Labor Class, and FCRA Class. "Settlement Collective" refers to all Shutdown Class members with respect to such members' collective action claims under 29 U.S.C. § 216(b).

Class Counsel will file a Motion for Approval of Attorneys' Fees and Reimbursement of Expenses along with their Motion for Final Approval of the Settlement.  Administration of the settlement will be conducted by Settlement Services, Inc., an entity experienced in the administration of wage-related and other employment class actions.

Under Rule 23(e)(1) of the Federal Rules of Civil Procedure, notice of a proposed settlement must be directed "in a reasonable manner to all class members who would be bound by the proposal."  Pending approval by the Court, the Settlement Administrator will issue notice to the Settlement Class, fully satisfying Rule 23(e)(1)'s notice requirement, by mailing a copy of the Notice of Proposed Class Action Settlement and Final Settlement Hearing in substantially the form attached to settlement agreement as Exhibit 2 to each Class Member.

### IV.    ARGUMENT:  THE COURT SHOULD PRELIMINARILY APPROVE THE PROPOSED SETTLEMENT

#### A.    The Settlement is within the range of fairness sufficient to send the class notice.

An initial analysis of the terms and features of the proposed class settlement in this case should give the Court confidence that it is substantively fair. At this stage, the Court must evaluate whether "giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(i–ii); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 28 (E.D.N.Y. 2019) (discussing Court's role at the preliminary approval stage following amendments to Fed. R. Civ. P. 23 which took effect on December 1, 2018).  To guide its analysis during the preliminary approval stage in

13

determining whether it will likely approve a proposal under Rule 23(e)(2), the Court looks to the factors contained in the text of Rule 23(e)(2), which a court must consider when weighing final approval. *See Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 28.

The amended Rule 23(e)(2) requires courts to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

These factors, newly established by the 2018 amendments to Rule 23, substantially overlap with, and are considered by Courts in conjunction with, the traditional preliminary approval factors outlined in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), which are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*See* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core

concerns of procedure and substance that should guide the decision whether to approve the proposal."); *Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 29 (observing advisory committee's note to 2018 amendment and considering both the newly established Rule 23 factors and the traditional *Grinnell* factors).

This procedure is against the backdrop of the strong policy in favor of settling class action lawsuits. *See Emeterio v. A&P Rest. Corp.*, No. 20-CV-970 (KHP), 2022 WL 274007, at *5 (S.D.N.Y. Jan. 26, 2022) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 116 (2d Cir. 2005) for the Second Circuit's observation noting the "strong judicial policy in favor of settlements, particularly in the class action context" (citation and internal quotations omitted)).

1. <u>The Class is Adequately Represented (First Rule 23 Factor and Second and Third Grinnell Factors).</u>

Class counsel have adequately represented the class members in this case by negotiating with Defendants for months to obtain the best result for class members. This entailed months of due diligence to assess the veracity of Defendants' claims of the limited availability of funds. Menken Decl. at ¶¶ 54-68. To that end, MSR engaged an accounting expert at a cost of roughly $60,000 to review Defendants' financial disclosures and opine on their financial status and thoroughly researched a host of issues bearing on Plaintiffs' legal claims. *Id*. The California attorney firms similarly worked diligently and expended significant resources in evaluating Defendants' finances and other relevant aspects of this case, as set forth in the Soderstrom, Forootan, Nosrati, and Lapuyade Declarations. Further, the proposed settlement is the result of months of vigorous arm's-length negotiations among no less than ten attorneys on opposite coasts of the United States representing the various parties, including a settlement conference before Magistrate Judge Dunst and a half-day private mediation before Martin Scheinman. *Id.* at ¶¶ 39,69-73, 80-93.

Named Plaintiffs have also adequately represented the class. As described *infra*, Named Plaintiffs participated in numerous conference calls with counsel, provided important documents and information, and offered valuable perspective on Sprout employees' goals for and perception of various settlement and litigation scenarios. Menken Decl. at ¶¶ 75-79. Named Plaintiffs in the California actions to be consolidated into the instant case were similarly helpful and giving of their time, as set forth in the Soderstrom, Forootan, Nosrati, and Lapuyade Declarations. Further, the fact that over 140 former Sprout employees have already chosen to opt into this action before a class is even certified or any notice has been distributed is a testament to the representation of both the named Plaintiffs and class counsel in this action, and demonstrates that the class is likely to have a positive reaction to the settlement.

In addition, the third *Grinnell* factor also favors settlement, as the agreement has been reached after the Plaintiffs' thorough, expert-assisted examination of the Defendants' relevant financial data, which has left the parties well-aware of the issues at hand and in a good position to fairly evaluate the risks of continued litigation.  Further, the parties have hashed out a host of issues through their numerous settlement discussions, including those facilitated by Magistrate Judge Dunst and Mediator Martin Scheinman, supporting the conclusion that all available options have been thoroughly explored and the settlement is not occurring at a premature stage of these proceedings.

2.    *The proposed settlement was negotiated at arm's length (Second Rule 23 Factor).*

As described *supra*, the parties engaged in vigorous arm's-length settlement negotiations over the course of more than six months, including numerous phone calls, email exchanges, document disclosures, an hours-long in-person settlement meeting at defense counsel's offices and two mediations. In considering the Defendants' financial status as a factor in the

16

reasonableness of any proposed settlement, Plaintiffs' counsel invested tens of thousands of dollars and many hours into verifying Defendants' claims of insolvency rather than simply taking their word for it.

Further, the settlement was negotiated not just between counsel for Plaintiffs and Defendants in this case, but also involved the five other law firms litigating the California Actions. Moreover, settlement negotiations were facilitated by both Magistrate Judge Dunst and mediator Martin F. Scheinman, incorporating multiple third-party neutral perspectives into the settlement discussions. Clearly, the settlement was negotiated at arm's length.

> 3. *Substantial costs and risks associated with further litigation make the proposed settlement reasonable and adequate (Third Rule 23 Factor and First, Fourth, Fifth, and Sixth Grinnell Factors).*

The relief provided for the class under the proposed settlement agreement is adequate, considering the costs, risks, and delay of trial and appeal. *See* Fed. R. Civ. P. 23(e)(2). First, the trial would be complex, with the Defendants likely to contest the accuracy of the Plaintiffs' damages calculations, as well as asserting affirmative defenses with regard to Plaintiffs' WARN claims based on their assertions that they were seeking finances at the time of the shutdown. Despite the strength of the claims against Corporate Defendants, Plaintiffs anticipate that Defendants would forcefully argue that individual Defendants are not personally liable (indeed, Defendants have already announced their intention to file a motion to dismiss against two of the individual defendants). *See* ECF No. 112. Further, the shutdown affected former Sprout employees in dozens of states across the country, potentially implicating numerous state laws that could augment and further complicate the claims and defenses at issue as the litigation progresses. The expense and duration of the trial, and possibly appeals, would also be large and

lengthy, especially considering the additional expense of ascertaining individual Plaintiffs' damages for healthcare expenses resulting from the shutdown and attendant loss of health insurance, as provided under Plaintiffs' ERISA claims.

Moreover, as explained *infra*, a trial (and potential appeal) in this case poses the serious risk that Plaintiffs could win a hollow victory by successfully proving liability but being unable to enforce a judgment against Defendants. *See* Section IV(A)(6), *infra*. Recovering on a judgment in this case would likely involve lengthy enforcement proceedings that would put the individual Defendants' available assets at issue, likely requiring the testimony of opposing financial experts and possibly resulting in Plaintiffs being ultimately unable to recover the full amount of any judgment, or taking years to do so.

Plaintiffs would also need to prove that a class is appropriate as to their claims against Defendants. "Courts generally acknowledge that a contested motion to certify a class would pose at least some increased risk that class certification might be denied." *Mikhlin v. Oasmia Pharm. AB*, No. 19-cv-4349(NGG)(RER), 2021 WL 1259559, at *6 (E.D.N.Y. Jan. 6, 2021) (citing *Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 40) (internal citation omitted). Here, the parties stipulate to class certification solely for the purpose of settlement. If the class action were litigated, however, Defendants likely would have opposed certification of a litigation class and may have mounted winning arguments, either as to the class as a whole or as to certain subsets of Plaintiffs, such as those who are owed unpaid commissions. The risks attendant to certifying a class and defending any decertification motion supports approval of the settlement. *See Garland v. Cohen & Krassner*, 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011) (citing *In re Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515, at *4 (E.D.N.Y. Aug. 7, 1998) (possibility that defendants would challenge

maintenance of a class in the absence of settlement was considered a risk to the class and potential recovery)).

Thus, settling the case saves significant time and expense and eliminates substantial risk, all factors favoring the settlement under both the Rule 23(e)(2) and *Grinnell* factors.

### 4.   *The proposed attorneys' fees are reasonable (Third Rule 23 Factor).*

The proposed settlement contemplates that class counsel will seek, and Defendants will not oppose, attorneys' fees of up to 33.33% of the Settlement Amount. All Plaintiffs' counsel will submit detailed time records and further briefing in support of the reasonableness of the proposed attorneys' fee in this particular case when they file their application for attorneys' fees following final approval of the settlement. However, for purposes of the instant motion, this amount is reasonable and in line with standard practice in the EDNY and Second Circuit.

Where a settlement agreement includes a provision for attorneys' fees, courts must "separately assess the reasonableness of plaintiffs' attorney's fees." *Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 366 (S.D.N.Y. 2013). Courts regularly approve attorneys' fees of up to one-third of the settlement amount in FLSA cases. *See, e.g.*, *Mariani v. OTG Mgmt., Inc.*, No. 16 CV 01751 (CLP), 2018 WL 10468036, at *12 (E.D.N.Y. Sept. 28, 2018) (finding attorneys' fee of one-third of the settlement fund reasonable); *Kochilas v. Nat'l Merchant Servs., Inc.*, No. 1:14-cv-00311, 2015 WL 5821631, at *8 (E.D.N.Y. Oct. 2, 2015) (finding class counsel's request in FLSA/NYLL case for one-third of the Settlement Fund to be reasonable and consistent with class litigation in the Second Circuit) (collecting cases); *Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143, 2011 WL 754862, at *6 (E.D.N.Y. Feb. 18, 2011) (awarding class counsel 33 1/3 % of the $7,675,000 Settlement Fund as fair and reasonable); *Clark v. Ecolab Inc.*, No. 04 Civ. 4488(PAC), 2010 WL 1948198, at *7–8 (S.D.N.Y. May 11, 2010) (awarding class counsel 33%

19

of $6 million settlement fund in FLSA and multi-state wage and hour case); *Stefaniak v. HSBC Bank, USA, NA*, No. 1-05-cv-7205, 2008 WL 7630102, at *3 (W.D.N.Y. June 28, 2008) (finding fee awards of 33% of the settlement fund typical of class action settlements in the Second Circuit) (collecting cases). Therefore, the proposed attorneys' fees are reasonable and favor preliminary approval of the settlement.

> 5.  *The method of distribution to class members is fair, equitable, and effective (Third and Fourth Rule 23 Factors).*

Finally, the proposed settlement establishes a reasonable method for distributing the Net Settlement Amount to class members and treats class members equitably relative to each other. The Settlement creates three sub-classes: the Shutdown Class, the California Labor Class, and the FCRA Class. *See* Ex. 1 at ¶¶ 5, 17, 54. Because members of the Shutdown Class suffered the greatest harm (*i.e.*, not being paid for three full weeks of work they had already performed), this class will receive the lion's share of the Net Settlement Amount. Approximately $1.78 million will be allocated to this class and will be distributed on a *pro rata* basis according to each class member's share of the wages and commissions due to them under the Sprout payrolls of July 7 and 22, 2022. *Id.* at ¶ 80. This will provide each Shutdown Class member with approximately 42% of the wages they are owed, without the risk and delay of having to try their claims against Defendants, and without having to make a contested motion to certify a class action, adding additional risk and delay.

The California Labor Class consists of those non-exempt Sprout employees who resided in California during their employment and who brought claims against Defendants for violations of California's minimum wage, overtime, meal and rest break, and reimbursement laws. *See* Third Amended Complaint at ¶ 5. The California Labor Class will be allocated a fixed amount of approximately $306,000, which will be distributed *pro rata* based on each class member's

regular rate of pay multiplied by the number of weeks they were employed by Defendants. Ex. 1 at ¶ 80.

The relatively low distribution to the California Labor Class as compared to the Shutdown Class is justified (and agreed to by the original counsel for the California Labor Class) for several reasons. First and foremost, as discussed *supra*, while the California Labor Class has legitimate and substantial legal claims that they were paid too little for their work, Shutdown Class members have gone *entirely unpaid* for three weeks of work they performed and will receive significant compensation those lost paychecks under this Settlement. When an employer fails to pay an employee their regular paycheck, it can cause immediate and severe financial hardship for the employee. Without their regular income, the employee may struggle to pay for basic necessities such as food, housing, and medical care, and may even face eviction or other serious consequences. While failing to pay overtime also causes financial harm to an employee, it may not have the same immediate and severe impact as withholding their regular paycheck. Overtime pay is typically a supplement to an employee's regular pay and is not necessarily relied upon for day-to-day expenses in the same way that regular pay is. Therefore, given the limited total amount available to settle all the Plaintiffs' claims, it is fair and equitable to allocate more funds to compensating Shutdown Class members. The relative degree of participation from the members of the two classes supports the conclusion that it is fair to allocate greater funds to compensating the Shutdown Class: while *Kelley*, which asserted the California Labor Class claims prior to the shutdown, has a single named Plaintiff and no opt-ins, *Agudelo* has four named Plaintiffs and over 120 opt-ins. Further, the California Labor Class's claims depend in large part on proving employees were misclassified as exempt from California's overtime laws, which is a difficult claim to prove and susceptible to more robust defenses compared to the

21

Shutdown Class Plaintiffs' essentially uncontested claim that they were not paid for three weeks of work. Finally, nearly half of the California Labor Class members are also included in the Shutdown Class, so those overlapping class members will be receiving compensation from both pools of settlement funds.

Finally, the FCRA Class consists of all former Sprout employees who resided in California while they were employed by Defendants. These class members have asserted claims against Defendants for violations of California's FCRA and ICRAA laws relating to employee background checks. *See* Third Am. Compl. at ¶ 5. By definition, each of these employees has suffered minimal harm because they were all ultimately hired despite Defendants' alleged unlawful background check practices. Therefore, each class member will receive a flat amount of $30 in compensation for these alleged violations, totaling $14,000. Ex. 1 at ¶ 80.

In addition, the Settlement provides for a penalty under California's Private Attorney General Act ("PAGA") in the amount of Twenty-Five Thousand Dollars ($25,000.00), with 75% to be paid to the LWDA ("PAGA Payment") and 25% to be paid to the relevant members of California Settlement Class in conformity with the Plan of Allocation. *See* Ex. 1 at ¶ 76.

6.   *Defendants cannot withstand a greater judgment (Seventh Grinnell Factor)*

The most significant factor counseling in favor of settlement in this case is that Defendants cannot withstand a greater judgment. While Plaintiffs are confident they would succeed at proving liability and securing a judgment at trial, class counsel has devoted substantial time and resources, including consulting with an expert forensic accountant at a cost of tens of thousands of dollars, to satisfying themselves that there are no additional assets that could be recovered through the litigation process to make them whole. *See* Menken Decl. at ¶¶ 54-68. Corporate Defendants have minimal assets left after the shutdown, and those assets are at

22

risk in numerous other litigations from creditors around the country, any of which could progress faster than this proceeding given various factors, including that most of them involve a single corporate Plaintiff rather than a class. **In New York alone**, these actions include *New Wave Lending Group, Inc. v. Sprout Mortgage Asset Trust et al*, 1:22-cv-06304-LLS (S.D.N.Y.) (seeking approximately $6 million); *DynAMC Solutions, LLC v. Sprout Mortgage, LLC*, 652469/2022 (N.Y. Sup. Ct.) (seeking approximately $3.4 million); *Wall Street Mortgage Bankers, Ltd. v. Sprout Mortgage Asset Trust*, 652687/2022 (N.Y. Sup. Ct.) (seeking at least $1 million); *Merchants Bank of Indiana v. Sprout Mortgage, LLC*, 2:22-cv-04480-GRB-SIL (E.D.N.Y.) (seeking $1,235,144.28); and *PNC Bank, National Association v. Sprout Mortgage, LLC et al*, 653697/2022 (N.Y. Sup. Ct.) (seeking $420,497.16 plus fees). Given the high likelihood that even if Plaintiffs were to secure a judgment against Defendants they could not enforce it, it is clearly in the best interest of class members to settle now while there are still available assets to be distributed.

7.    *The settlement is reasonable in light of the best possible recovery and all possible recovery scenarios (Eighth and Ninth Grinnell Factors).*

As discussed *supra*, the best possible recovery for Plaintiffs would likely be over $20 million, accounting for liquidated damages, punitive damages, and attorneys' fees, assuming Plaintiffs successfully proved liability on every claim asserted. However, given the reality of Defendants' financial position, even if Plaintiffs successfully proved liability on all of their claims (an outcome which is by no means guaranteed given Defendants' stated intention to assert affirmative defenses as to Plaintiffs' WARN claims, which make up fully half of their damages calculation), this recovery appears to be possible only in theory. A more realistic best-case scenario is something much closer to what is achieved by the settlement proposed here:

23

liquidation of all Defendants' available assets to satisfy Plaintiffs' claims to the greatest extent possible.

Thus, the proposed settlement is well within the range of fairness required to preliminarily approve the settlement and send the class notice.

**B.      The proposed service awards are appropriate.**

The proposed apportionment of the settlement also provides for the payment of additional amounts to the proposed ten named Plaintiffs of the Consolidated Actions in the total amount of $25,000.00, or $2,500.00 each, representing just 0.7% of the total settlement. It is very common in class and collective cases for service or incentive payments to be paid to named Plaintiffs or class representatives in addition to their proportionate share of the recovery. Such payments compensate Plaintiffs for the additional efforts, risks, and hardships they have undertaken as class representatives on behalf of the group in filing and prosecuting the action. Courts around the country have approved substantial incentive payments in FLSA collective actions and other employment-related class actions. *See, e.g.*, *Mondrian v. Trius Trucking, Inc.*, No. 119-cv-00884 (ADA)(SKO), 2022 WL 6226843, at *14 (E.D. Cal. Oct. 7, 2022) (approving awards of $10,000 for each named plaintiff and collecting cases supporting same); *Reynolds v. Fid. Invs. Institutional Operations Co., Inc.*, No. 1:18-CV-423, 2020 WL 92092, at *5 (M.D.N.C. Jan. 8, 2020) (approving incentive awards of $20,000 and $15,000 for the two named plaintiffs); *In re Janney Montgomery Scott LLC Fin. Consultant Litigation*, 2009 WL 2137224, *12 (E.D. Pa. Jul. 16, 2009) (approving incentive payments of $20,000 each to three named Plaintiffs); *Bredbenner v. Liberty Travel, Inc.*, 2011 WL 1344745, *22-23 (D.N.J. Apr. 8, 2011) (approving incentive payments of $10,000 to eight named plaintiffs; citing 2006 study referenced in 4 Newberg on Class Actions § 11.38, at 11-80, that showed average incentive award to class representatives to

24

be $16,000); *Wineland v. Casey's General Stores, Inc*., 267 F.R.D. 669 (S.D. Iowa 2009) (approving incentive payments of $10,000 per named plaintiff and $1,000 for each deponent in FLSA case on behalf of over 11,000 cooks and cashiers employed by convenience store 11 chain); *Clark v. Ecolab, Inc*., 2010 WL 1948198 (S.D.N.Y. May 11, 2010) (approving $10,000 service awards to 7 named plaintiffs in hybrid class/collective action involving unpaid overtime); and *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005) (approving incentive award to class representative of $10,523.37, which represented 8.4% of the total settlement fund).

The named Plaintiffs in the Consolidated Actions have devoted substantial amounts of time to this case, were always available to discuss the case, and participated in frequent phone calls with Plaintiffs' counsel to discuss litigation strategy and offer the perspective of Sprout employees. Menken Decl. at ¶¶ 75-79. Plaintiffs further provided counsel with important documents in the early days of this litigation prior to defense counsel's document disclosure, enabling class counsel to make informed decisions when drafting and filing the Complaint in this action. *Id*. Thus, each of the named Plaintiffs were actively involved and hugely helpful to counsel in the prosecution of this matter and it is reasonable to compensate them for their contribution above and beyond their role as class members.

**V.  A SETTLEMENT CLASS SHOULD BE CERTIFIED AGAINST DEFENDANTS**

The benefits of the proposed Settlement can be realized only through the certification of a settlement class.  The Supreme Court of the United States has emphatically confirmed the viability of such settlement classes. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997). So, too, have the federal appeals courts.  *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 119 S. Ct. 890 (1999) ("Prudential

II"); *Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998). The use of such settlement classes, where the parties have engaged in and concluded settlement negotiations prior to class certification and notice, has been clearly approved by this Circuit, *Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir. 1982), *cert denied,* 464 U.S. 818, 78 L.Ed.2d 89, 104 S.Ct. 77 (1983), so long as "district judges who decide to employ such a procedure... scrutinize the fairness of the settlement with even more than the usual care." *Id.*, at 73. *See also In re Prudential Securities Inc.*, 163 F.R.D. at 205 ("tentative or temporary settlement classes are favored when there is little likelihood of abuse, and the settlement is fair and reasonable and under the scrutiny of the trial judge,") (quoting *In re Beef Indust. Antitrust Lit.* 607 F.2d 167, 174 (5th Cir. 1979), *cert denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981)).

The parties propose the certification of the following Classes for settlement purposes only:

1.  The "Shutdown Class," defined as "All employees of Sprout Mortgage who were employed at any time between June 6, 2022 and July 7, 2022 and did not receive wages for work performed during that period;"

2.  The "California Labor Class," defined as "All non-exempt employees of Sprout Mortgage who worked for Sprout Mortgage while residing in California between February 22, 2018, and July 6, 2022;" and

3.  The "FCRA Class," defined as "All employees of Sprout Mortgage who worked for Sprout Mortgage while residing in California between February 22, 2017, and July 6, 2022."

*See* Ex. 1, ¶¶ 5, 17, 54.

**A. The Rule 23 Requirements.**

"[I]t seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Hasemann v. Gerber Prod. Co.*, No. 15-cv-2995 (MKB)(RER), 2019 WL 2250687, at *3 (E.D.N.Y. Feb. 20, 2019), *report and recommendation*

26

*adopted as modified*, 331 F.R.D. 239 (E.D.N.Y. 2019) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (further citations omitted). Accordingly, "[t]he Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction" *Id.* (quoting *Marisol A.*, 126 F.3d at 377). *See also Jankowski v. Castaldi*, 2006 WL 118973, 01-cv-0164 (SJF)(KAM) at \*1 (E.D.N.Y. Jan. 13, 2006) (courts considering class certification "are to adopt a standard of flexibility").

Rule 23 permits a class to be certified when it satisfies the elements of Rule 23 (a) and one of the subsections of Rule 23(b). *See In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006) ("*IPO*"). The Rule 23 (a) elements are:

> (1) the class is too numerous for joinder to be practicable;
>
> (2) the class shares at least one common question of law or fact;
>
> (3) the named plaintiffs' claims are typical of the class; and
>
> (4) the named plaintiffs will adequately represent the class.

*Id.*

Rule 23(b)(3), under which plaintiffs seek certification here, requires "predominance, *i.e.*, law or fact questions common to the class predominate over questions affecting individual members, and superiority, *i.e.*, class action is superior to other methods." *IPO* at 32. All of these requirements are satisfied here.

**B.     B. The Class Satisfies Rule 23(a).**

*1.     The Class is Sufficiently Numerous.*

Courts in the Second Circuit presume numerosity when the putative class has at least forty members. *Puddu v. 6D Glob. Techs., Inc.*, No. 15-cv-8061 (AJN), 2021 WL 1910656, at \*2 (S.D.N.Y. May 12, 2021) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d

27

Cir. 1995)). Since the proposed class comprises over 700 class members (Ex. 3) numerosity is satisfied.

### 2.  *Commonality is Satisfied.*

"Commonality is satisfied where a single issue of law or fact is common to the class." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) (internal quotation omitted); *Barone v. Safway Steel Products, Inc.*, 2005 WL 2009882, 03-cv-4258 (E.D.N.Y. August 23, 2005) at *4; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359, 131 S. Ct. 2541, 2556, 180 L. Ed. 2d 374 (2011) ("Even a single common question will do.") (internal quotations and modifications omitted); *Haddock v. Nationwide Fin. Servs., Inc.*, 262 F.R.D. 97, 116 (D. Conn. 2009) ("Commonality is established so long as the plaintiffs can identify some unifying thread among the members' claims.") (quotation and citation omitted). "[C]ommonality has never been understood to require that all issues must be identical as to each member, but rather [to] require[] that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Williams v. KuCoin*, No. 20-cv-2806 (GBD)(RWL), 2021 WL 5316013, at *11 (S.D.N.Y. Oct. 21, 2021), *report and recommendation adopted*, No. 20-cv-2806, 2022 WL 392404 (S.D.N.Y. Feb. 9, 2022) (quoting *Meyer v. USTA*, 297 F.R.D. 75, 83 (S.D.N.Y. 2013)).

The requisite commonality is present here, in that the class members all claim that Defendants failed to properly compensate them under federal and state labor laws.[3] This is sufficient to satisfy Rule 23(a)(2). *See Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 129 (S.D.N.Y. 2011) (quoting *Barone*, 2005 WL 2009882, at *4 (commonality satisfied where "plaintiffs allege a common wrong -- that Safway failed to pay the prevailing wages and

---

[3] All California Class members also assert claims under California's FCRA and ICRAA, supporting commonality for purposes of the FCRA Class. *See Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 364 (S.D.N.Y. 2014) (in FLSA action, finding commonality existed for proposed subclass under NYLL because it alleged a common employment

supplemental benefits required for public works contracts")); *Haddock*, 262 F.R.D. at 117 ("If one or more Class members brought suit individually, they would raise the same legal claim, that is, that Nationwide breached its fiduciary duty [in violation of ERISA] . . . . Thus, the commonality requirement is met.").

In addition, as the Shutdown Plaintiffs allege and the evidence shows, the Defendants' alleged wrong arose from a common factual background – namely, the shutdown without notice of Sprout Mortgage on July 6, 2022, and Defendants' subsequent failure to pay wages owed to employees for work already performed.  These facts show that commonality is satisfied. *See Koss v. Wackenhut Corp.*, 2009 WL 928087, at *6, 03-cv-7679(SCR) (S.D.N.Y. Mar. 30, 2009) (where security officer potential class members did not receive a promised bonus, they "allege injury from a common policy or set of facts, [and] the commonality requirement is met.").

### 3.    *The Named Plaintiffs' Claims are Typical of the Class's Claims.*

Rule 23(a)(3) "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Gortat v. Capala Bros.*, No. 07-cv-3629 (ILG)(SMG), 2009 WL 3347091, at *6 (E.D.N.Y. Oct. 16, 2009), *report and recommendation adopted*, No. 07-cv-3629 (ILG), 2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010), *aff'd*, 568 F. App'x 78 (2d Cir. 2014) ("*Gortat II*") (quoting *Marisol A.*, 126 F.3d at 376). The typicality requirement requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical. *See Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 399 (E.D.N.Y. 2022) (quoting *Bolanos v. Norwegian Cruise Lines,* 212 F.R.D. 144, 155 (S.D.N.Y. 2002) ("[s]ince the claims

---

policy that affected all members of the subclass).

29

only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding.") (quotation and citation omitted)).

Here, typicality is satisfied for the same reasons as commonality. *See Gortat II* at *6 (quoting *Marisol A.*, 126 F.3d at 376) ("[t]he commonality and typicality requirements tend to merge into one another, so that similar considerations animate the analysis of each."). That is, the putative named Plaintiffs' and class members' claims arise from the same core set of facts. *See supra*. And, Plaintiffs and the class make the same relevant claims, namely, that they were employees of Defendants who were laid off with no notice, in violation of the federal and state WARN Acts, were not paid earned wages in violation of the FLSA and state labor laws, and were not properly notified of background checks in violation of the FCRA/ICRAA. For these reasons, typicality is present and the class should be certified. *See Gortat II*, 2009 WL 3347091, at *6 (finding typicality where "[n]amed plaintiffs allege that they each performed similar work for Defendant and that, like the other members of the class, they were never compensated for all the hours they worked as a result of Defendant' common scheme to deprive employees of pay for all hours worked") (quotation omitted).

### 4.    *The Class is Adequately Represented.*

Adequacy under Rule 23(a)(4) "typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quotation and citation omitted). *See also Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008) (applying same inquiry in wage-and-hour context); Fed. R. Civ. P. 23(g) (considering lawyers' qualifications in appointing class counsel).

Here, Plaintiffs' interests are not antagonistic to the class, and Plaintiffs and the class all allege the same wrongs and seek the same relief. *See Mikhlin*, 2021 WL 1259559, at *4 (finding class representatives adequate where "[a]ll class members, including the class representatives, suffered similar injuries as a result of the same alleged misconduct by Defendants. The class representatives seek to recover against Defendants on their own behalf and on behalf of the class."). Further, nothing suggests any conflicts between Plaintiffs and the class, or that Plaintiffs will not adequately and aggressively represent the class. Finally, Defendants do not challenge the adequacy of Plaintiffs as representatives of the class. *See Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701 (RPK)(RER), 2022 WL 2841909, at *19 (E.D.N.Y. July 16, 2022) ("Because Defendant has not challenged the adequacy of the Plaintiff or his chosen counsel, because Plaintiff's interests are not antagonistic to the class, and because his counsel have sufficient qualifications to represent the class, the Court concludes that the Plaintiff has satisfied his burden of establishing adequacy under Rule 23(a)(4).").

In addition, because commonality and typicality are satisfied, adequacy is satisfied. *See Damassia*, 250 F.R.D. at 158 ("[t]he fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class"). Finally, plaintiffs' class counsel, Bruce Menken, Scott Simpson and Brenna Rabinowitz, are qualified, experienced and able to conduct this litigation, and have been found adequate class counsel in numerous cases. *See Grottano v. City of New York*, 15-CV-9242 (RMB) (S.D.N.Y.) (secured $12.5 million settlement on behalf of a class of visitors who were subject to invasive searches upon entry into City of New York jails to visit their family and friends); *Rodriguez v. Simplex Grinnell*, 16-cv-9605 (N.D. Ill.) ($2.6 million settlement on behalf of laborers, workmen, and mechanics who were not paid prevailing wage for their work on non-federal public works in Illinois); *Ramos, et*

31

*al., v. SimplexGrinnell LP*, 796 F. Supp. 2d 346 (E.D.N.Y.) (certifying class of over 500 electrical and sprinkler technicians in NY state-wide prevailing wage case that settled in maintenance and repair claims for $5.525 million in 2012 and testing and inspection claims for $9.5 million in late 2014); *Marriot v. Montgomery County*, 03-cv-531 (DNH) (N.D.N.Y.) (inmate strip-search class action); *Bruce v. County of Rensselear*, 02-cv-847 (TJM/DRH) (N.D.N.Y.) (inmate strip-search class action); *McDaniel v. County of Schenectady*, 04-cv-0757 (GLS/RFT) (N.D.N.Y.) (inmate strip-search class action); *Perez v. Consolidated Housekeeping*, 18-cv-2979 (RER) (E.D.N.Y.) (wage and hour case that settled for $1 million in 2019); *Bahena v. Park Avenue South*, 15-cv-1507 (VSB) (S.D.N.Y.) (wage and hour case on behalf of building superintendents that settled for $650,000 in 2018.) Therefore, adequacy is present, and the class should be certified.

### C.       The Class Satisfies Rule 23(b)(3).

Certification is appropriate under Rule 23(b)(3) because (1) "questions of law or fact common to class members predominate" over questions affecting only individual class members and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating [this] controversy." Fed. R. Civ. P. 23(b)(3).

### 1.       *Common Questions Predominate.*

Predominance is satisfied when "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *In re Visa Check / MasterMoney Antitrust Litig.*, 280 F.3d 126, 136 (2d Cir. 2001) (quotation, citation and alteration omitted); *Gortat II*, 2009 WL 3347091, at *7 (same). "When determining whether common questions predominate courts focus on the liability issue[,] and if the liability issue is common to the class, common questions are

held to predominate[.]" *Bolanos*, 212 F.R.D. at 157-58 (quotation, citation and alteration omitted).

Issues "predominate" when they are fundamental to the claim. *See Koss*, 2009 WL 928087, at *11 ("While some degree of individualized analysis will be necessary . . . the fundamental factual issue -- whether [bonuses should have been] paid . . . -- is subject to generalized proof" therefore predominance was satisfied). In wage cases such as this, the fundamental issues are whether the employer paid its employees properly, therefore predominance generally is found. *See also Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 345 (S.D.N.Y. 2004) (where "the gravamen of [plaintiffs']claim is that Defendant . . . deprived employees of . . . overtime pay[,] [a]lthough [some] determinations . . . will require individualized findings, common liability issues otherwise predominate").

As with commonality, predominance will not be defeated by such factual variations as job titles, hours, and locations of work. *See Gortat II*, 2009 WL 3347091, at *7 (differences in position, hours and method of payment "do not predominate over the main issue: . . .that Defendant paid all of these employees for fewer hours than they claim to have worked"), *citing Gortat v. Capala Bros.*, 257 F.R.D. 353, 362 (E.D.N.Y. 2009) ("*Gortat I*") (finding Defendant's arguments regarding these "distinctions" "not persuasive"); *Bolanos*, 212 F.R.D. at 157-58 (rejecting defendant's argument that "each class member must individually prove actual overtime worked in the unique circumstances of his or her position, . . . [location,] time and place" because plaintiffs' claims are based on alleged across-the-board deprivation of overtime wages[,]" therefore predominance was satisfied); *see also Gonzalez v. Zito Racing Stable Inc.*, 04-cv-22 (SLT)(AKT), 2008 WL 941643, at *7 (E.D.N.Y. Mar. 31, 2008) ("some factual

33

variation among the circumstances of the class members is inevitable and does not defeat the predominance requirement").

As demonstrated earlier, numerous common questions of law and fact exist here, such as whether Defendants violated state and federal wage and hour laws with respect to all class members.  In addition, the issue of damages is common to the class, since each class member's damages can be proven by reference to the common timesheets and payroll records in Defendants' possession. Under these circumstances, predominance is satisfied. *Mendez I*, 232 F.R.D. at 93 (where plaintiffs challenge "policies, which allegedly have been applied in a more or less uniform fashion to [all] employees[,] . . . [common issues] 'predominate over those issues that are subject only to individualized proof'") (quoting *Visa Check*, 280 F.3d at 136).

2.      *A Class Action is the Superior Method for Resolving This Dispute.*

Because the most important questions of law and fact are common to the class, Rule 23(b)(3) is satisfied because a class action is the superior method for resolving Plaintiffs' and the class's claims**.** In this case, lawyers from across the country have collectively spent hundreds of hours working together to consolidate their clients' claims into one action that can be efficiently resolved, rather than maintaining four separate lawsuits with overlapping claims against the same Defendants. Class members have little interest "in individually controlling . . . separate actions." Fed. R. Civ. P. 23 (b)(3)(A).  Many of the class members seek modest damages that are unlikely to justify the cost of individual litigation. *See Barone*, 2005 WL 2009882, at *3; *Pesantez*, 673 N.Y.S.2d at 661. Further, "concentrating the litigation in [this] forum simplifies and streamlines the litigation process." *See id.* (finding superiority on this ground); *see also Barone*, 2005 WL 2009882, at *3 (certifying prevailing wage class to "save [] considerable time and expense"). Deciding all class members' claims in this Court would also eliminate the risk of inconsistent

34

findings as to Defendants' liability. *See Kelen v. World Fin. Network Nat. Bank*, 302 F.R.D. 56, 67 (S.D.N.Y. 2014) (noting the reasons for certifying a settlement class include "the elimination of repetitious litigation and possibly inconsistent adjudications).    Finally, a class action is superior because it would be manageable. *See* Fed. R. Civ. P. 23(b)(3)(D). As demonstrated *supra*, the many common questions in this case predominate over any individual questions. *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) ("we perceive little difficulty in managing a class action of liability, especially since . . . any individualized inquiries will be few and far between"). To the extent that individual issues exist, "most of [them] can be resolved by [] documentary evidence[,]" *See Pesantez*, 673 N.Y.2d at 661; *see also Haddock*, 262 F.R.D. at 128-29 (where defendant "produced data demonstrating the amount of [wrongful] revenue sharing payments . . . determining the appropriate figure [of disgorgement] for each class member requires a mechanical calculation using readily available data[,]" therefore class action was manageable). Further, because the class in this case is to be certified for settlement purposes only, "the difficulties of managing a class action are not relevant here." *Kelen*, 302 F.R.D. at 67. For all of these reasons, a class action is the superior method for adjudicating this case. Therefore, the class should be certified.

### VI. THE COURT SHOULD CONDITIONALLY CERTIFY A COLLECTIVE PURSUANT TO THE FLSA FOR SETTLEMENT PURPOSES

The parties also move for conditional certification of an FLSA collective action, so that notice of settlement of those claims may be sent to the class.  In deciding whether to approve an FLSA collective action settlement, courts consider, among other things: (1) the plaintiffs' range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the

35

seriousness of the litigation risks faced by the parties; (4) whether the settlement is the product of arm's length bargaining between experienced counsel; and (5) the possibility of fraud or collusion. *Pernal v. Proflame Inc.*, No. 21-cv-4526 (JMW), 2022 WL 16636689, at *2 (E.D.N.Y. Nov. 2, 2022) (citing *Wolinsky v. Scholastic Inc.*, 900 F.Supp.2d 332, 335 (S.D.N.Y. 2012) for the "*Wolinsky* Factors" used to evaluate settlements). These factors should be considered in light of the totality of the circumstances. *Wolinsky*, 900 F.Supp.2d at 335.

Courts are mindful of the fact that "FLSA collective actions do not implicate the same due process concerns as Rule 23 actions." *Viafara v. MCIZ Corp.*, No. 12 Civ. 7452, 2014 WL 1777438, at *8 (S.D.N.Y. May 1, 2014). Therefore, "'[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes.'" *Hall v. ProSource Techs., LLC*, No. 14-cv-2502 (SIL), 2016 WL 1555128, at *8 (E.D.N.Y. Apr. 11, 2016) (quoting *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 476 (S.D.N.Y. 2013)). Due to the fact that the standard for approval of an FLSA settlement is lower than for a Rule 23 settlement, however, satisfaction of the Rule 23 and *Grinnell* nine factor analysis will, necessarily, satisfy the standards of approval of the FLSA settlement." *Henry*, 2014 WL 2199427 at *7 (internal citation and quotation marks omitted).

The proposed settlement provides that a class member's signature on the settlement check serves as a release of the class member's FLSA claims. *See* Ex. 1, ¶ 82.  This procedure, combined with the Court's approval, is a proper and efficient way to resolve the FLSA claims. *See Soriano v. D&J Export*, 18-cv-00194-RLM (E.D.N.Y. June 26, 2019); *Gonqueh v. Leros Point to Point*, 14-cv-5883-GHW(GWG), 2016 WL 791295, *4 (S.D.N.Y. Feb 26, 2016).

### VII. THE PROPOSED NOTICE IS ADEQUATE AND SHOULD BE APPROVED

Rule 23(e) provides that "notice of the proposed dismissal or compromise shall be given

36

to all members of the class in such manner as the court directs." The *Manual for Complex Litigation, Fourth* § 21.633 recommends that: "[o]nce the judge is satisfied as to the certifiability of the class and the results of the initial inquiry into the fairness, reasonableness, and adequacy of the settlement, notice of a formal Rule 23(e) fairness hearing is given to the class members." Again, "'[w]here the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.'" *Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*, No. 08-cv-321 (VB) (PED), 2012 WL 857891, at *4 (S.D.N.Y. Feb. 24, 2012) (citation omitted).

Here, the terms of the settlement and benefits offered by it will be communicated effectively to the class. The Class Notice will be mailed to all Class Members. The Notice will provide recipients with the address, phone number, and email address of the Class Counsel to whom class members may write for information concerning the Settlement. This procedure provides adequate notice to the absent class members. "It is well-settled that in the usual situation first class mail and publication fully satisfy the notice requirements of Fed. R. Civ. P. 23 and the due process clause." *Zimmer Paper Products Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985); *see also Wolfert ex rel. Est. of Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 176 (2d Cir. 2006) (collecting cases supporting adequacy of first class mail and finding notice via first class mail plus publication was sufficient to satisfy due process). In this case, since the mailing address of each class member is available from Defendants' records, and class counsel will follow up and investigate to find current addresses for any class notice that is returned, publication will not be necessary.

37

In addition, the contents of the proposed notice are adequate.  "[T]he settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'  Notice is 'adequate if it may be understood by the average class member.'"  *Wal-Mart Stores,* 396 F.3d at 114 (citations omitted).  Each section of the Class Notice is preceded by a heading which clearly indicates the section topic and why the Class member should read it.  The Class Notice strikes the appropriate balance between thoroughness and clarity by including brief, simple, and accurate descriptions of all of the following: (1) what the lawsuit is about; (2) the basic terms of the settlement and release of Defendants; (3) the definition of the Class; (4) the identity of Plaintiffs' counsel; (5) the res judicata effect of the settlement and final judgment on Class Members; (6) the options available to Class Members, including objecting to the Settlement; (7) the procedures for exercising the various options, including the time deadlines and method of appearing; (8) the date, time, location, and purpose of the final fairness hearing; (9) how to get additional information and/or review the complete Settlement Agreement; and (10) each class member's settlement share.  *See* Ex. 2.

The Parties' Settlement Agreement and Proposed Notice set forth a proposed timetable that would allow a Fairness Hearing to be conducted after the sixty-day notice period.  Notice would be sent to Class Members within twenty-one days after the date of preliminary approval, and Class Members would have sixty days from the Notice Date to object to the settlement, state their intention to appear and be heard at the Fairness Hearing, or to sign and return the FLSA release.

The Court should therefore approve the proposed Class Notice and the plan for its distribution.

## VIII. A FINAL FAIRNESS HEARING SHOULD BE SCHEDULED.

The Court should schedule a final fairness hearing to obtain all required information to determine that class certification is proper and the settlement should be approved. *See Manual for Complex Litigation, Fourth* §21.633 (2011). The fairness hearing will provide a forum for proponents and opponents to explain, describe, or challenge the terms and conditions of the class certification and settlement, including the fairness, adequacy, and reasonableness of the settlement. The Settlement provides for a 60-day notice period. Accordingly, to allow time for the final preparation and mailing of the class notices, Plaintiffs request that the Court schedule the final fairness hearing for on or after 60 days after the decision on this motion.

## IX. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order: (1) preliminarily approving a class settlement with Defendants; (2) directing notice to Class members regarding the proposed Class Settlement; (3) conditionally certifying the FLSA class; (4) scheduling a final approval hearing, and (5) entering the proposed Order for Preliminary Approval.

Respectfully submitted,

Dated: June 1, 2023                 By: _____/s/_____
                                         Bruce Menken

                                     MENKEN SIMPSON & ROZGER LLP
                                     80 Pine Street, 33rd Floor
                                     New York, New York 10005
                                     (212) 509-1616

39